UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO: 2:18-cr-20-FtM-29MRM

MIGUEL MCSWAIN

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's Motion for Pre-Trial Suppression Hearing, filed on April 4, 2018.  (Doc. 20).  Defendant is charged with one count of violating 18 U.S.C. §§ 924(g)(1) and 924(a)(2), possession of a firearm and ammunition as a convicted felon.  (Doc. 1 at 1-2).  Defendant seeks to suppress "direct and derivative evidence," including physical evidence and declarations resulting from his arrest on August 9, 2017 at a residence located at 2991 Douglas Avenue in Fort Myers, Florida.  (Doc. 20 at 1).  The United States filed a response in opposition on April 30, 2018.  (Doc. 29).  Defendant filed a reply on May 8, 2018.  (Doc. 34). The Undersigned conducted an evidentiary hearing on May 10, 2018.[1]  This matter is ripe for review.

For the reasons explained below, the Undersigned respectfully recommends that Defendant's Motion for Pre-Trial Suppression Hearing (Doc. 20) be **GRANTED IN PART** and **DENIED IN PART**.

## I.      Summary of the Evidence

At the outset of the suppression hearing, the Government moved without objection to admit into evidence Government's Exhibits 1-8.  (Tr. at 8).  The Court granted the motion and

---

[1]  A transcript of the evidentiary hearing is filed at Doc. 49.  The Undersigned refers to the transcript herein as "Tr."

received Government Exhibits 1-8 into evidence. (*Id.* at 9). Defendant then moved without objection to admit Defense Exhibit F into evidence. (*Id.*). The Court granted the motion and received Defense Exhibit F into evidence. (*Id.*).

The parties' exhibits admitted into evidence are as follows:

- Exhibit 1 is bodycam video from Officer Zachary Ross;
- Exhibit 2 is bodycam video from Officer Brandon Birch;
- Exhibit 3 is bodycam video from Officer Jari Sanders;
- Exhibit 4 is bodycam video from Officer Adam Vasquez;
- Exhibit 5 is bodycam video from Officer Eric Reitler;
- Exhibit 6 is bodycam video from Officer Walter Mickey;
- Exhibit 7 is an interview with Defendant Miguel McSwain;
- Exhibit 8 is an Order of Probation from *Florida v. McSwain*, 14-CF-018749; and
- Exhibit F is an Order of Probation from *Florida v. McSwain*, 14-CF-016098.

(Doc. 43 at 1; Doc. 44 at 1).

Defendant called two witnesses at the suppression hearing: (1) Elizabeth McIntosh; and (2) Defendant Miguel McSwain. (Tr. at 12, 29).

The Government called three witnesses at the hearing: (1) Officer Zachary Ross; (2) Officer Brandon Birch; and (3) Jari Sanders. (*Id.* at 42, 73, 110). Although their bodycam footage was admitted into evidence, Officer Adam Vasquez, Officer Eric Reitler, and Officer Walter Mickey did not testify at the hearing. The bodycam footage from Vasquez, Reitler, and Mickey, and Defendant's interview video were not published at the hearing.

## II. Factual Summary

Based on the testimony and evidence from the suppression hearing, the Undersigned gives the following factual summary.

### A.    Defendant's Presence at the Residence

The Undersigned first discusses testimony from Defendant McSwain and Elizabeth McIntosh regarding Defendant's presence at 2991 Douglas Avenue on August 8-9, 2017.

The residence at 2991 Douglas Avenue is a duplex split into two units, Unit A and Unit B.  (*See* Tr. at 30, 78).  Elizabeth McIntosh was the primary resident in Unit A on August 8-9, 2017.  (*See id.* at 12-13, 30, 55).  Ms. McIntosh lived at the apartment for almost two years.  (*Id.* at 13:8).  In addition to Ms. McIntosh, other people lived at the apartment in August 2017, including:  (1) Ms. McIntosh's son, Rodjay; (2) Rodjay's girlfriend, Till; and (3) Ms. McIntosh's daughter, Joneisha.  (*Id.* at 17).

Ms. McIntosh is "something like" a former girlfriend of Defendant.  (*Id.* at 25:9-10).  At the time of Defendant's arrest on August 9, 2017, however, Ms. McIntosh and Defendant were not dating.  (*Id.* at 16).  Nevertheless, they did have an ongoing sexual relationship.  (*Id.*).  Ms. McIntosh testified that Defendant stayed at her apartment frequently.  (*Id.*).  Ms. McIntosh further testified that Defendant did not need her permission to come to her apartment.  (*Id.*).

Ms. McIntosh did not spend the night at her apartment on August 8, 2017.  (*Id.* at 14).  Instead, Ms. McIntosh stayed at a friend's house.  (*Id.*).  Before she went to her friend's house, however, Ms. McIntosh went to her apartment.  (*Id.* at 15).  Ms. McIntosh testified that Defendant McSwain was present at her apartment with her son at that time.  (*Id.* at 14).  Ms. McIntosh testified that she returned to her apartment the next morning at around 8:00 a.m. to get ready for work.  (*Id.* at 15-16).  When she arrived home, Defendant was asleep in her bed.  (*Id.*).  Ms. McIntosh left again after this time.  (*Id.* at 16).  Ms. McIntosh returned later that day when Defendant was arrested.  (*Id.*).

On cross-examination, Ms. McIntosh was repeatedly pressed on details of her testimony. (*See id.* at 16-27). She conceded that she had no direct knowledge that Defendant stayed at her apartment the whole night. (*Id.* at 23-24). Additionally, Ms. McIntosh testified that Defendant did not bring any personal items such as a suitcase to her apartment on August 8. (*Id.* at 23). Further, contrary to her testimony on direct examination, Ms. McIntosh testified that she came home to get ready for work at 9:00 a.m., not 8:00 a.m. on August 9. (*Id.* at 27).

Even so, Ms. McIntosh never wavered from her testimony that she saw Defendant with her son at her apartment on the night of August 8, 2017, and then saw Defendant at her apartment in her bed the next morning when she returned home. (*Id.* at 20, 23). Additionally, Ms. McIntosh reiterated that Defendant was allowed to stay at her apartment as long as he wished. (*Id.* at 22).

Defendant McSwain also testified at the suppression hearing regarding his stay at Ms. McIntosh's apartment. (*Id.* at 29). Defendant testified that he was dropped off at the apartment sometime around 8:00 p.m. or 9:00 p.m. on August 8, 2017. (*Id.*). Defendant testified that he was waiting for Ms. McIntosh to get off work. (*Id.*). Rodjay was home at that time. (*Id.*). Defendant testified that he visited Rodjay on almost a daily basis. (*Id.* at 29:24). Defendant testified that he stayed at the apartment on the night of August 8, 2017, sleeping in Ms. McIntosh's bed. (*Id.* at 30). Defendant testified that he went to sleep around 1:00 a.m. and woke up around 9:30 a.m. (*Id.*).

On cross-examination, Defendant testified that an individual named Michael Jackson driving a gold Altima dropped him off at 2991 Douglas Avenue on August 8. (*Id.* at 31).[2]

---

[2] The transcript states that Michael Jackson was driving a gold "Ultima," but the Undersigned believes this is a scrivener's error.

Defendant testified that he had spent at least four nights at the apartment in the month preceding his arrest.  (*Id.* at 32).  Defendant further testified that the only personal items he brought with him to the apartment were his phone, money, and identification.  (*Id.* at 33-34).  Defendant did not bring a toothbrush, change of clothes, backpack, deodorant, or even a wallet.  (*Id.* at 33).

Defendant testified that he, Rodjay, Till, and Joneisha stayed at the apartment the night of August 8.  (*Id.* at 34).  Defendant further testified that he did not leave the apartment at any point on August 9, 2017.  (*Id.* at 36-37).  Defendant testified that he finally left the house on August 9 when Till asked him to come outside and he was arrested.  (*Id.* at 40).

### B.    The Car Chase

The events leading up to Defendant's arrest on August 9, 2017 began with a short car chase.  (Tr. at 43-44, 73).  On that day, Officer Zachary Ross and Officer Brandon Birch, members of the gang suppression unit of the Fort Myers Police Department, were conducting a proactive patrol in a marked police car.  (*Id.* at 42-43, 73).  Officer Ross testified at the suppression hearing that, at approximately 12:30 p.m., a white Toyota Camry rolled through an intersection and ran a stop sign.  (*Id.* at 43).  Both officers testified that they had a clear look at the driver of the vehicle.  (*Id.* at 44, 74).  At the hearing, both Officer Ross and Officer Birch identified Defendant as the individual driving the car.  (*Id.*).

Officer Ross was driving the police car and attempted to make a traffic stop.  (*Id.* at 43-44).  The white Camry, however, accelerated quickly.  (*Id.* at 45).  After only 20 to 30 seconds, Officer Ross terminated the chase for safety reasons.  (*Id.* at 46).  The officers, however, were able to view the vehicle from afar.  (*Id.*).  Both officers testified that they saw the vehicle make a turn in the distance.  (*Id.* at 46, 95).  The officers then canvased the area to see if they could locate the vehicle, which they did less than a minute later at 2991 Douglas Avenue.  (*Id.* at 46,

75, 98).  On cross-examination, both officers testified that the white Camry was parked when

they arrived at the address.  (*Id.* at 68, 100).  Neither officer saw a driver get out of the car or run

into the building.  (*Id.*).

### C.   Defendant's Arrest

Officer Ross and Officer Birch were first to arrive at the duplex.  (Tr. at 46).  Upon

arrival, officers approached the white Camry to see if other occupants were inside the vehicle.

(*Id.* at 47).  Upon reaching the vehicle and looking inside, officers located a firearm between the

driver's seat and the glovebox.  (Gov. Ex. at 2; Tr. at 48).  Officers secured the gun.  (Gov. Ex. 2;

Tr. at 50).  Other officers began arriving at the scene, including William Schulte, Jari Sanders,

and Walter Mickey.  (Tr. at 49, 51).  Officers called the vehicle in to dispatch, which reported

back to the officers that the vehicle had been reported stolen.  (*Id.* at 52).  A K-9 searched the

vacant lot across the street.  (*Id.* at 68).

The video shows that the officers on scene believed Rodjay lived at the duplex.  (Gov.

Ex. 1; Tr. at 54).  Officers pulled up Rodjay's image from the Lee County Sherriff's Office

warrants database.  (*Id.*).  Officer Ross – at that time – believed with "100 percent" certainty that

Rodjay was the driver of the white Camry.  (Gov. Ex. 1; Tr. at 55).  Officer Birch, however, saw

the picture and was not sure whether Rodjay was the driver.  (Tr. at 80).

After seeing the picture of Rodjay, officers opened a gate and approached both the front

and back doors of Unit A.  (*Id.* at 55, 102).  Officers then attempted to get Rodjay to leave the

apartment.  (*Id.*).  Notably, the video evidence shows officers suggesting that a call be placed to

Ms. McIntosh about the situation to get a key, so they did not "have to smash the door down."

(Gov. Ex. 1-3; Tr. at 55, 83).  The officers ultimately testified, however, that police were

unsuccessful in contacting Ms. McIntosh by phone.  (Tr. at 108, 122).

In an effort to get Rodjay to come out of the apartment, officers set up a perimeter around the duplex with weapons drawn, loudly knocked on the door, and loudly requested that Rodjay come out with his hands up. (Gov. Ex. 1-2; Tr. at 57, 70, 83, 100). For instance, the video shows that Officer Birch loudly announced "[l]isten, man, we don't want to send the dog in there. Just come out with your hands up . . . Do it now." (Gov. Ex. 2; Tr. at 83). Officer Birch testified that informing the occupants that the officers did not want to send in the dogs was not a threat but rather a tactic to attempt to get the occupants out of the building. (Tr. at 102-03). Additionally, the video evidence shoes that Officer Birch also announced that the officers were not going to leave until Rodjay came out. (Gov. Ex. 2; Tr. at 84).

During this time, additional officers showed up, including Miguel Hernandez, Eric Reitler, and Adam Vasquez. (Tr. at 56-58). Officer Jari Sanders, also working with the gang suppression unit, testified that he contacted the residents in Unit B. (*Id.* at 111). The residents in Unit B confirmed that Ms. McIntosh lived in Unit A. (Gov. Ex. 3; Tr. at 116).

Bodycam video from Officer Sanders shows that Ms. McIntosh arrived roughly 15 minutes after officers first arrived at the duplex. (Gov. Ex. 3). During that time, officers never left the premises, staying at the front and back doors. (Gov. Ex. 1-3). Officers repeatedly requested that Rodjay come out of the apartment, but no one came out of the apartment. (*Id.*). After Ms. McIntosh arrived, Officer Sanders told her that Rodjay had been driving the stolen vehicle. (Gov. Ex. 3; Tr. at 119). Ms. McIntosh did not believe that Rodjay was the driver. (*Id.*). Instead, she said the driver was someone else in the apartment. (*Id.*).

The video shows that Ms. McIntosh called the occupants inside the apartment on her cell phone. (Gov. Ex. 3; Tr. at 121-22). Ms. McIntosh then loudly instructed Till to open the door. (*Id.*). The door eventually opened from the inside. (Gov. Ex. 3; Tr. at 123). Rodjay came out

first. (*Id.*). Ms. McIntosh would not let officers enter the apartment. (*Id.*). Defendant did not come outside at this time, but Ms. McIntosh indicated that Defendant was inside and that she would tell him to come out. (*Id.*). During this time, she indicated that the car was Defendant's. (Gov. Ex. 3; Tr. at 124). She also stated that she did not want to go to jail and that she was on probation. (*Id.*). Eventually, Defendant exited the house. (Gov. Ex. 3; Tr. at 125).

Defendant testified that he finally left the house on August 9, 2017 when Till asked him to come outside. (Tr. at 40). When Defendant exited the apartment, he was arrested. (Gov. Ex. 3; Tr. at 59, 125). Although Rodjay was briefly detained, officers did not take him into custody. (Tr. at 90). No one else was arrested. (*See id.*). After Defendant came out of the house, it immediately became clear to Officer Ross – who had originally believed that Rodjay was the driver – that Defendant was the driver. (*Id.* at 60). Similarly, Officer Birch testified that as soon as he saw Defendant exit, he identified Defendant was the driver of the white Camry. (*Id.* at 88).

### D.     Post-Arrest Interview and DNA Sample

Government Exhibit 7 is video recording of a police interview of Defendant after his arrest. In pertinent part, the video shows that Defendant's probation status was discussed. (Gov. Ex. 7). Additionally, the gun found in the white Camry was discussed. (*Id.*). During the conversation, Defendant admitted to touching the gun, but denied the gun was his. (*Id.*). Officers told Defendant that he was going to jail after the interview. (*Id.*). After a short break, a DNA sample was taken from Defendant via a buccal swab. (*Id.*). Defendant was told that the DNA sample would be compared to DNA on the gun. (*Id.*). The video does not show that officers obtained express consent to take the DNA buccal swab. (*Id.*). Before the interview ended, Defendant discussed other places officers could find guns in the community. (*Id.*).

At the hearing, Officer Birch testified that he was not sure who took the DNA sample from Defendant, but it was either Officer Sanders or himself.  (Tr. at 106).  Officer Birch testified that he told Defendant that his DNA sample would be used to test DNA on the gun. (*Id.*).  Officer Birch testified that the DNA sample was tested against the DNA on the gun, and it matched Defendant's DNA.  (*Id.* at 106-07).  Officer Birch further testified that he did not have a search warrant or written consent from Defendant to get his DNA at that time.  (*Id.*).

At the suppression hearing, Officer Sanders testified that he took a DNA sample from Defendant during the interview.  (*Id.* at 128).  Officer Sanders stated that they took the sample for a comparison of Defendant's DNA with the DNA on the gun because Defendant was a convicted felon.  (*Id.*).  Officer Sanders testified that he believed that the DNA sample was taken in compliance with Florida statutes allowing for arrestees to have DNA samples taken.  (*Id.*).

Additionally, Officer Sanders testified that prior to taking the buccal swab from Defendant, he had learned from Defendant that Defendant was on probation for a firearm offense.  (*Id.*).  Officer Sanders also testified that he was aware, when he took the DNA swab, that Defendant was under arrest for fleeing and eluding law enforcement and for the firearm found in the white Camry.  (*Id.* at 129).  In addition, Officer Sanders testified that he knew a standard condition of probation in Florida is that offenders may not possess firearms.  (*Id.* at 130).  Officer Sanders also testified that he knew Defendant was a convicted felon.  (*Id.*).

On cross-examination, Officer Sanders testified that he told Defendant that his DNA sample would be used to test DNA on the gun.  (*Id.* at 136).  Officer Sanders further testified that he did not have a search warrant or consent from Defendant to get his DNA at that time.  (*Id.*). On redirect, Officer Sanders testified that Defendant's DNA was on the firearm.  (*Id.* at 137).

### III.     Discussion

In addressing the issues raised by the parties, the Court must first address whether Defendant has standing to contest the alleged violations.  Second, the Undersigned evaluates whether Defendant's rights were violated at 2991 Douglas Avenue and whether the evidence should be suppressed on that basis.  Finally, the Undersigned addresses whether the DNA sample taken from Defendant was lawful.

### A.     Standing

As a preliminary matter, Defendant must establish standing to challenge the validity of the search and seizure.  *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).[3]  Indeed, the Fourth Amendment only prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  As a result, "only individuals who have a legitimate expectation of privacy in the area invaded have standing to invoke the protections of the Fourth Amendment."  *United States v. Vasquez-Padilla*, 330 F. App'x 883, 887 (11th Cir. 2009) (citing *Smith v. Maryland,* 442 U.S. 735, 740 (1979); *Cooper*, 203 F.3d at 1284).  Moreover, "Fourth Amendment rights . . . are personal."  *Cooper*, 203 F.3d at 1284.  Thus, "only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search."  *Id.*

An individual has a legitimate expectation of privacy under the Fourth Amendment if he or she (1) exhibits an actual expectation of privacy and (2) the privacy expectation is one that society is prepared to recognize as reasonable.  *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (citations omitted).  Thus, to establish standing to challenge the validity of

---

[3]  As an initial matter, neither party addresses Defendant's standing to contest the DNA sample taken from him by police.  The Undersigned finds that Defendant has standing to contest the DNA buccal swab, discussed in greater detail in Part III.C., *infra*.

a government search, an individual must demonstrate both a subjective and an objective expectation of privacy. *Id.*

Defendant contends that he has standing because he argues that he had a legitimate expectation of privacy as an overnight guest of Ms. McIntosh at the apartment. (Doc. 20 at 6; Doc. 34 at 1; Tr. at 139-40 (citing *Minnesota v. Olson*, 495 U.S. 91, 98-100, (1990))). Defendant further contends that this legitimate expectation of privacy extends to the curtilage of the property—specifically, the ingress and egress of the apartment at the front and back doors. (Doc. 34 at 1; Tr. at 139 (citing *Olson*, 495 U.S. at 98-100)). Defendant argues that this area is where, as discussed in Part III.B., *infra*, the violation of his rights occurred from an unconstitutional "knock and talk" conducted by law enforcement. (Doc. 34 at 2; Tr. at 142).

In response, the Government argues that Defendant failed to meet his burden of proving standing. (Tr. at 144). Indeed, the Government argues that the testimony of Ms. McIntosh and Defendant is not credible and, therefore, should not be accepted by the Court. (*Id.* at 145-46). Furthermore, the Government argues that there is no direct evidence that Defendant spent the night at Ms. McIntosh's apartment. (*Id.* at 145). Thus, the Government argues that the evidence is circumstantial at best. (*Id.*).

Furthermore, the Government argues that Defendant was not an overnight guest at the time his arrest occurred. (*Id.* at 147-48). The Government notes that the arrest occurred in the afternoon on August 9, 2017. (*Id.* at 147). The Government also points out that there was no testimony that Defendant was planning to spend the night of August 9, 2017 at the apartment. (*Id.*). Thus, the Government argues that Defendant was not an overnight guest when he was arrested. (*Id.* at 148).

Additionally, even assuming Defendant was an overnight guest, the Government contends that Defendant has not shown that whatever reasonable expectation of privacy he enjoyed *inside* the apartment as an overnight guest extends *outside* of the walls of the home. (Doc. 29 at 6). The Government notes that the side yard of the duplex at 2991 Douglas Avenue was shared with Unit B. (*Id.*). Because the area is accessible by persons entering Unit B, the Government argues that any reasonable expectation of privacy that Defendant may claim in that area is significantly diminished. (*Id.* at 6-7 (citing *Thomas v. United States*, No. 03 CR 902, 2010 WL 4340461 (N.D. Ill. Oct. 22, 2010); *United States v. Butler*, No. 06-CR-215, 2007 WL 2220260 (E.D. Wis. Aug. 1, 2007))).

Finally, the Government argues that Defendant had a diminished expectation of privacy as a probationer. (Doc. 29 at 7 (citing *Owens v. Kelley*, 681 F.2d 1362 (11th Cir. 1982)). The Government argues that this expectation of privacy is further diminished because both Ms. McIntosh and Rodjay were probationers at the same time. (*Id.* at 8).

After careful review of the evidence presented at the suppression hearing and the parties' arguments, the Undersigned finds that: (1) Defendant has sufficiently established standing as an overnight guest at Ms. McIntosh's apartment; (2) this standing extends to the curtilage of the property; and (3) Defendant's status as a probationer does not affect his standing.

### 1.   Whether Defendant Was an Overnight Guest

The Supreme Court of the United States has recognized that individuals enjoy a legitimate expectation of privacy as overnight guests. *Olson*, 495 U.S. at 96-97. Indeed, as the Court in *Minnesota v. Olson* noted:

> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy. The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest. It is unlikely that the guest will be confined to a restricted area of the

house; and when the host is away or asleep, the guest will have a measure of control over the premises. The host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. On the other hand, few houseguests will invite others to visit them while they are guests without consulting their hosts; but the latter, who have the authority to exclude despite the wishes of the guest, will often be accommodating. The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Id.* at 99.

Here, Defendant did not own or rent Unit A at 2991 Douglas Avenue and, thus, had no legal interest in the premises. Nevertheless, the Undersigned finds that Defendant's and Ms. McIntosh's testimony – though not entirely credible as to certain matters – sufficiently establishes that Defendant McSwain was an overnight guest of Ms. McIntosh at the apartment.

As to the credibility of the testimony, the Undersigned finds that parts of Ms. McIntosh's testimony were not entirely credible. For instance, certain details changed from direct examination to cross examination. For one, contrary to her testimony on direct examination, Ms. McIntosh testified that she came home to get ready for work at 9:00 a.m., not 8:00 a.m. on August 9. (Tr. at 27). Additionally, the Undersigned finds that Ms. McIntosh was suspiciously vague about the details of her activities on the night of August 8, 2017. Ms. McIntosh testified that she did not spend the night of August 8, 2017 at her apartment. (*Id.* at 14). Instead, she stayed at a friend's house. (*Id.* at 14). Ms. McIntosh offered few details about her stay at the friend's house. (*Id.*).

Similarly, the Undersigned finds that Defendant's testimony at the hearing was not entirely credible. For example, on cross-examination, Defendant testified that an individual suspiciously named "Michael Jackson" driving a gold Altima dropped him off at 2991 Douglas Avenue on August 8. (*Id.* at 31). The sarcasm and aggression with which Defendant testified on

this point at the hearing was palpable to the Undersigned, though it is impossible to glean from a written transcription of the testimony.  Defendant offered few details about this individual notwithstanding that his means of transportation to the apartment – other than by use of a stolen vehicle – would tend to help him here.  (*See id.*).  Similarly, Defendant expressly testified that he did not leave the house at any point on August 9, 2017.  (*Id.* at 36-37).  This testimony, however, directly contradicts the testimony of two officers, both of whom testified at the hearing that they saw Defendant driving the white Camry before his arrest.  (*See id.* at 60, 88).  The Undersigned credits the testimony of the officers – notwithstanding Officer Ross' initial expressed belief and certainty that Rodjay was driving the car – over Defendant's testimony because the officers gave no indication that their testimony was less than truthful.  Conversely, Defendant's demeanor and tone when testifying concerning his friend "Michael Jackson" seriously undermined his credibility.

Even so, the Undersigned finds that Defendant's and Ms. McIntosh's testimony together establishes that Defendant McSwain was an overnight guest of Ms. McIntosh at the apartment on the night of August 8, 2017.  For instance, although Ms. McIntosh conceded that she had no direct knowledge that Defendant stayed at the house the whole night, she never wavered from her testimony that she saw Defendant with her son at her apartment on the night of August 8, 2017, and then saw Defendant at her apartment in her bed asleep the next morning when she returned home.  (*Id.* at 20, 22-23).  Indeed, although Ms. McIntosh was repeatedly pressed on details of her testimony, those key details never changed.  (*See id.* at 16-27).

For his part, Defendant testified that he stayed at the apartment on the night of August 8, 2017.  (*Id.* at 30).  Defendant specifically testified that he slept in Ms. McIntosh's bed, going to sleep around 1:00 a.m. and waking up around 9:30 a.m.  (*Id.*).  Further, even though he did not

bring any items to the apartment other than his phone, money, and identification on August 8, Defendant testified that he had spent at least four nights there in the previous month.  (*Id.* at 32-34).

The Undersigned finds that this testimony sufficiently establishes that Defendant spent the night of August 8, 2017 at Ms. McIntosh's apartment.  Indeed, although the testimony of both Ms. McIntosh and Defendant was not entirely credible for the reasons stated *supra*, the Undersigned finds no basis on which to discredit their specific testimony that Defendant spent the night of August 8, 2017 at 2991 Douglas Avenue.  Further, while the Undersigned credits the officers' testimony over Defendant's testimony, nothing from the officers' testimony contradicts the testimony from both Defendant and Ms. McIntosh that Defendant spent the night of August 8, 2017 at the apartment.

Nevertheless, the Government also argues that Defendant was not an overnight guest at the time of his arrest because the arrest occurred in the afternoon the next day and because there was no testimony that he was planning to spend the night of August 9, 2017 at the apartment.  (*See* Tr. at 147-48).  While the Government did not cite any authority in support of this position, this argument has logical appeal.  Moreover, the Undersigned notes that a jurist of this Court has previously held, in the context of a post-conviction motion under 28 U.S.C. § 2255, that a "departure and subsequent return for a purpose unrelated to being an overnight guest mark a break from whatever 'overnight guest' status [the individual] previously held."  *Campbell v. United States*, No. 3:09-CR-51-J-34MCR, 2015 WL 3770271, at *10 (M.D. Fla. June 17, 2015), *aff'd*, 891 F.3d 940 (11th Cir. 2018).

In *Campbell v. United States*, United States District Judge Marcia Morales Howard denied the plaintiff's motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.  *Id.*

at *1.  In denying the motion, Judge Howard evaluated whether the plaintiff's trial counsel was ineffective in litigating a motion to suppress by failing to establish a reasonable expectation of privacy as an overnight guest at a residence.  *Id.* at *5.  Judge Howard found that the plaintiff's "departure and subsequent return for a purpose unrelated to being an overnight guest mark[ed] a break from whatever 'overnight guest' status he previously held."  *Id.* at *10.  To be precise, Judge Howard found that, when he returned, the plaintiff was no longer at the residence for the purpose of seeking repose under the shelter of a kind host but was instead "present for a quintessentially commercial purpose."  *Id.*  Specifically, the plaintiff was there to await the delivery of drugs he planned to distribute for profit.  *Id.*  Accordingly, "given that the search occurred the *evening after* [the plaintiff] was an overnight guest, the fact that [the plaintiff] did not intend to spend the following night at the house, and evidence that [the plaintiff] left the house and later returned for a purpose wholly unrelated to being an overnight guest," Judge Howard found that the plaintiff could not claim that his expectation of privacy in the residence as an overnight guest carried over from January 7, 2009, into the evening hours of January 8, 2009.  *Id.* (emphasis in original).

Here, similar to *Campbell*, the testimonial evidence suggests that Defendant left the residence at some point in the morning on August 9, 2017.  (*See* Tr. at 60, 88).  The Undersigned specifically credits the officers' testimony that Defendant was the driver of the vehicle that ran the stop sign.  (*Id.*).  Moreover, Defendant only brought his phone, money, and identification to the apartment on August 8, 2017, which does not indicate an intent to stay for a prolonged period of time.  (*See id.* at 33-34).  Additionally, as pointed out by the Government, there was no testimony that Defendant had planned to stay at the apartment on the night of August 9, 2017.

Yet *Campbell* is materially distinguishable.  For instance, in *Campbell*, the arrest occurred the following evening.  2015 WL 3770271, at \*10.  Here, however, the arrest occurred in the early afternoon, only a few hours after Defendant woke up from sleeping in Ms. McIntosh's bed at the apartment.  (*See* Tr. at 40; Gov. Ex. 1-3).

Furthermore, unlike *Campbell*, the Undersigned cannot find that Defendant returned to the apartment for a purpose wholly unrelated to being an overnight guest.  In *Campbell*, a key fact in Judge Howard's finding that the plaintiff was not an overnight guest was that he had left the house and later returned for a purpose wholly unrelated to being an overnight guest— specifically to await the delivery of drugs that he hoped to sell for profit.  2015 WL 3770271, at \*10.  As noted in *Campbell*, the Supreme Court has long held that guests have no reasonable expectation of privacy in another's home when visiting exclusively for a commercial purpose such as selling drugs for a short period of time.  *Id.* (citing *Minnesota v. Carter*, 525 U.S. 83 (1998)).  Similarly, as noted in *Campbell*, the Eleventh Circuit has held that even overnight guests lack a reasonable expectation of privacy when they are at an apartment mainly in connection with a drug enterprise.  *Id.* (citing *United States v. Bell*, 218 F. App'x 885, 895-96 (11th Cir. 2007)).

Here, while Defendant may have returned to the apartment, in part, to evade law enforcement, his decision to go to the apartment as opposed to all other locations he could have went was likely informed by his relationships with the people living in the apartment.  His decision to return, unlike *Campbell*, does not appear to have been for commercial reasons.  *See id.*  Indeed, Ms. McIntosh testified that Defendant McSwain did not have to ask her permission to come over and that he was allowed to stay at her apartment as long as he wished.  (Tr. at 16, 22-23).  Additionally, Ms. McIntosh indicated that, although they were not dating at the time, she

and Defendant had an ongoing sexual relationship. (*Id.* at 16). Defendant also testified that he had spent at least four nights at the apartment in the month preceding August 8, 2017. (*Id.* at 32-34). Further, Defendant testified that he went to see Rodjay, who also lived at the apartment, almost daily. (*See id.* at 29). Based on his repeated stays at the apartment, it is clear here that Defendant subjectively believed that he was welcome at the apartment at any time and that he was in fact welcome to stay as an overnight guest. (*See id.*). This is consistent with Ms. McIntosh's testimony that Defendant could stay whenever he pleased. (*Id.* at 16, 22-23). Thus, the Undersigned cannot find that Defendant returned to the apartment for a purpose wholly unrelated to being an overnight guest. *Cf. Campbell*, 2015 WL 3770271, at *10.

Here, even though Defendant left the apartment and came back, the Undersigned nonetheless finds that Defendant has shown that he was an overnight guest of Ms. McIntosh at the time of his arrest. *See id.* Important to this determination is that the arrest occurred a short period of time after Defendant woke up and that Defendant spent the previous night at the apartment. *See id.* Even more critically, due to Defendant's relationships with the people in the apartment, including the primary tenant who testified that Defendant could come over whenever he wanted and stay as long as he pleased, the Undersigned cannot find that Defendant returned to the apartment for a purpose wholly unrelated to being an overnight guest. *See id.*

In sum, the Undersigned finds that Defendant has shown subjective expectation of privacy in the apartment. Given that it is objectively reasonable to extend the protections of the Fourth Amendment to overnight guests, the Undersigned finds that Defendant should be afforded the protections of being an overnight guest under the Fourth Amendment. *See Segura-Baltazar*, 448 F.3d at 1286 (finding that an individual has a legitimate expectation of privacy under the

Fourth Amendment if he or she exhibits an actual expectation of privacy and the privacy expectation is one that society is prepared to recognize as reasonable).

In any event, as discussed in greater detail in Part III.B., *infra*, the Undersigned finds the actions of the police officers did not produce the contested evidence. Thus, even if Defendant was not an overnight guest, suppression of the evidence would not be warranted here.

### 2. Whether Defendant Has Standing to Contest an Intrusion in the Shared Side Yard of the Duplex

Although the determination of whether Defendant was an overnight guest was not straightforward, another difficult question arises when considering whether Defendant's status as an overnight guest accords him standing in the shared side yard of the duplex.

For his part, Defendant offered no argument that he had a legitimate expectation of privacy in the shared side yard. Indeed, at the suppression hearing, Defendant's counsel specifically noted that Defendant was not arguing that he had a reasonable expectation of privacy in the shared side yard. (Tr. at 140). Instead, Defendant argues that he had a legitimate expectation of privacy in the ingress and egress of the apartment, which location is where Defendant argues the violation of his rights occurred. (*Id.* at 142).

There is no clear, binding authority on whether an overnight guest has a reasonable expectation of privacy in the curtilage of property of this nature. Even so, the Undersigned finds that Defendant has standing to challenge the actions of law enforcement in the curtilage.

In reaching this conclusion, the Undersigned considers the Eleventh Circuit's decisions in *United States v. Maxi*, 886 F.3d 1318, 1325-26 (11th Cir. 2018) and *United States v. Merricks*, 572 F. App'x 753, 757 (11th Cir. 2014). While neither case directly addresses whether overnight guests have standing to contest searches of the curtilage, the Undersigned finds that these cases

provide a general framework for determining standing in this case.  *See Maxi*, 886 F.3d at 1326; *Merricks*, 572 F. App'x at 757.

    In *Maxi*, the Eleventh Circuit found that the defendant had standing to challenge a search at a duplex.  886 F.3d at 1326.  In making this finding, the court noted that the defendant had given somewhat contradictory information about his relationship to the duplex.  *Id.*  For instance, when he first opened the door, he told police he did not live there, did not know who did, and did not have a key.  *Id.*  At the suppression hearing, however, the defendant testified that he had been living at the duplex for three to six months but also that he was living at his father's house.  *Id.* The defendant also stated that he was not at the duplex every day, kept his clothes at his father's house, and only kept his food stamp card, Social Security card, and Western Union papers at the duplex.  *Id.*  On cross examination, however, the defendant "clarified that he had lived at both the duplex and at his father's house, but that he'd been kicked out of his father's house."  *Id.* The defendant also "testified that he paid half the rent to the duplex and had a key."  *Id.*

    On those facts, the Eleventh Circuit concluded that that the defendant had standing to challenge the search at the duplex.  *Id.*  Despite disclaiming his privacy interest, the court noted that a disclaimer is only one factor in evaluating the defendant's reasonable expectation of privacy in the duplex.  *Id.* (citation omitted).  The court further noted that the defendant paid rent, had a key, had been living at the duplex intermittently, and kept important papers there.  *Id.* The court further noted that, while most of the defendant's personal effects were at his father's house, the defendant also testified that he had been kicked out of his father's house, leaving the duplex as his only place to stay.  *Id.*  The court found that the defendant "was more than just an overnight guest—he was effectively a subtenant."  *Id.*  While the defendant also performed commercial activities at the duplex, the court found that this fact did not vitiate his expectations

of privacy as a subtenant.  *Id.*  Thus, the court held that the defendant had a reasonable expectation of privacy in the duplex and affirmed the district court's finding that he had standing to challenge the search.  *Id.*  Of note, the court expressly evaluated whether the actions of law enforcement breaching the curtilage in a "knock and talk" were lawful.  *Id.* at 1326-28; *see also* Discussion at Part III.B., *infra*.

In *Merricks*, the Eleventh Circuit affirmed the district court's finding that the defendant lacked standing to challenge the warrantless entry onto the curtilage of the home.  572 F. App'x at 757.  In reaching that conclusion, the court noted that, at the time of the defendant's arrest, the defendant was not an overnight guest because he had not stayed overnight at the house for at least three weeks.  *Id.*  Additionally, the court noted that the defendant did not have an unrestricted right of custody or control over the residence.  *Id.* (citing *United States v. Sarda-Villa*, 760 F.2d 1232, 1236 (11th Cir. 1985) for its finding that standing may be demonstrated through an unrestricted right of occupancy).  The court found that, although the defendant sometimes used one of the bedrooms, he did not keep clothes in the room, and the owner permitted other individuals to use the bedroom.  *Id.*  Further, the court noted that the defendant did not receive mail at the home or pay rent.  *Id.*  Moreover, even though the defendant possessed a key to the house, the court found that possession of a key and mere presence on the property was insufficient to establish he had a reasonable expectation of privacy.  *Id.* (citing *Sarda-Villa*, 760 F.2d at 1236 for the court's recognition that a defendant cannot establish standing based solely on the possession of a key to an apartment).  Thus, the court found that the defendant did not have standing.  *Id.*

Here, *Maxi* is factually distinguishable in one critical way.  Specifically, the court in *Maxi* found that the defendant was more than an overnight guest.  886 F.3d at 1326.  Indeed, the

court found that the defendant was effectively a subtenant. *Id.* Unlike *Maxi*, the facts here do not suggest that Defendant McSwain was effectively a subtenant. For instance, Defendant did not bring or leave any items in the apartment. (Tr. at 32-34). Further, Defendant did not pay rent or otherwise indicate that he had nowhere else to live. (*See id.*). Moreover, Defendant never stated that he had a key. (*See id.*). Thus, unlike *Maxi*, the Undersigned cannot find that Defendant was effectively a subtenant. *See* 886 F.3d at 1326. Because Defendant's status as an overnight guest is something less than that of a subtenant, *Maxi* does not directly answer the question of standing here. *See id.*

In *Merricks*, the court found that the defendant lacked standing to challenge the warrantless search of the curtilage because he was neither an overnight guest nor did he have an unrestricted right of custody or control over the residence. 572 F. App'x at 757. Unlike *Merricks*, the Defendant here was an overnight guest. *See id.* Although the court in *Merricks* implied and seemed to assume that the defendant would have had standing to contest the search of the curtilage as an overnight guest, it did not expressly analyze that issue. *See id.* Because the court did not address that issue and because Defendant was an overnight guest here, *Merricks* also does not directly answer the question of whether standing exists in this case. *See id.*

The facts of the present case place it somewhere between *Maxi* and *Merricks*. *See Maxi*, 886 F.3d at 1326; *Merricks*, 572 F. App'x at 757. On the one hand, *Maxi* makes clear that owners, renters, and people who are effectively subtenants have standing to contest entry on the curtilage. *See* 886 F.3d at 1326. On the other hand, *Merricks* makes clear that those persons who are (1) not an owner or renter, (2) not an overnight guest, or (3) are only occasionally present at a residence do not have standing to contest a search of the curtilage. *See* 572 F. App'x at 757.

Acknowledging the lack of binding authority within the Eleventh Circuit, the Government cites two cases – *Thomas v. United States*, No. 03 CR 902, 2010 WL 4340461 (N.D. Ill. Oct. 22, 2010) and *United States v. Butler*, No. 06-CR-215, 2007 WL 2220260 (E.D. Wis. Aug. 1, 2007) – in support of the proposition that Defendant lacks standing in the side shared yard.  (Doc. 29 at 6-7).  Neither case is directly on point.

In *Thomas v. United States*, the United States District Court for the Northern District of Illinois denied the plaintiff's motion to vacate his conviction pursuant to 28 U.S.C. § 2255.  2010 WL 4340461, at *1.  In *Thomas*, the court rejected the plaintiff's claim that his Fourth Amendment rights had been violated by officers in the back yard of his grandmother's home.  *Id.* at *6.  There, the plaintiff argued that he was an overnight guest at his grandmother's house.  *Id.* The court noted, however, that even if the plaintiff "was in fact an overnight guest, however, he would nevertheless have no reasonable expectation of privacy in the curtilage of the house." (citations omitted).  Moreover, the court noted that "[w]hile the need for a guest's privacy is reasonable, the expectation of privacy does not extend to those areas of the house—the backyard, for example—in which the guest's privacy would not likely be respected."  *Id.* (citing *Olson,* 495 U.S. at 99).  Critically, however, the court did not expressly address the plaintiff's standing to contest the alleged violations.  *See id.*  Instead, the court only rejected the plaintiff's contention that any violations of his rights had occurred.  *See id.*

In *Butler*, the United States District Court for the Eastern District of Wisconsin denied the defendant's motion to suppress.  2007 WL 2220260, at *7.  There, the court found that the defendant's Fourth Amendment rights were not violated when officers searched a shared back yard.  *Id.*  In making this finding, however, the court noted that "[b]oth the government and [the defendant] agreed that [the defendant] was an overnight guest at the residence and therefore has

standing to challenge the search." *Id.* Although the defendant argued that this determination should settle the question of whether he had an expectation of privacy in the back yard, the court found that the "issue relates only to whether [the defendant] had standing to challenge the search at all, not *where* he held a legitimate expectation of privacy." *Id.* (emphasis in original). The court expressly found that the defendant had standing to object to the search. *Id.* Nevertheless, the court found that because the defendant did not have a reasonable expectation of privacy in the back yard, the officers' presence there did not violate the defendant's Fourth Amendment rights. *Id.*

As the cases cited by the Government make clear, the issue of whether Defendant has *standing* to contest a violation under the Fourth Amendment and whether a *violation* occurred are separate issues. The Government has not cited any authority suggesting Defendant does not have standing as an overnight guest to contest the officers' entry on the curtilage.

Furthermore, other courts around the country have found that overnight guests enjoy a legitimate expectation of privacy in the curtilage of a home and, therefore, had standing to contest police action there. *See United States v. Blatchford*, No. CR-16-08085-001-PCT0GMS, 2017 WL 2484195 (D. Ariz. June 8, 2017); *United States v. Rodriguez*, No. 1:08CR32-SPM, 2009 WL 762203, at *9 (N.D. Fla. Mar. 18, 2009).

For instance, in *United States v. Blatchford*, the United States District Court for the District of Arizona granted in part and denied in part the defendant's motion to suppress. 2017 WL 2484195, at *5. In pertinent part, the court discussed whether the defendant had standing as an overnight guest to contest the search of his grandmother's home and her curtilage. *Id.* The court found that the defendant, at a minimum, was an overnight guest. *Id.* As a result, citing *Olsen*, the court found that the defendant had a legitimate expectation of privacy in his

grandmother's home as well as her curtilage. *Id.* Thus, the court necessarily found that the defendant had standing to contest the search. *See id.*

As a further example, in *United States v. Rodriguez*, the United States District Court for the Northern District of Florida impliedly found that, because two of the defendants were overnight guests, those defendants had standing to contest the officer's actions on the curtilage of the home. 2009 WL 762203, at *9. In *Rodriguez*, the court found that two of the defendants had standing in the residence because they were overnight guests of another defendant. *Id.* at *4. Having found standing in the residence, the court next evaluated whether the officers' actions in the curtilage, specifically a knock and talk, were valid. *Id.* at *7-8. The court ultimately found that the officers exceeded the scope of a permissible knock and talk and suppressed the evidence for the three defendants, including the two overnight guests. *Id.* at * 9. In doing so, the court necessarily found – but did not expressly state – that the two overnight guests had standing to contest the officers' actions in the curtilage of the home. *See id.* Indeed, if the court had not found that the two overnight guests had standing to contest the officers' actions in the curtilage, then the court would have denied the motion to suppress. *See id.*

Here, consistent with the decisions above, the Undersigned finds that Defendant has standing to contest entry on the curtilage due to his status as an overnight guest. As noted above, *Merricks* impliedly accepts the premise that an overnight guest has standing to contest violations on the curtilage. *See* 572 F. App'x at 757. Indeed, the court there found that the defendant lacked standing to contest the warrantless search of the curtilage because he was neither an owner or renter nor an overnight guest. *Id.* The logical converse of this statement is that the defendant would have had standing to contest the search if he had been either an owner/renter **or** an overnight guest. *See id.* This is the exact scenario with which the Court is presented now.

Moreover, as discussed above, other courts have impliedly found that overnight guests have standing to challenge entry on to the curtilage. *See Blatchford*, 2017 WL 2484195, at *3; *Rodriguez*, 2009 WL 762203, at *9. Logically, the Undersigned finds no principled basis on which to reject standing here. *See Merricks*, 572 F. App'x at 757; *Blatchford*, 2017 WL 2484195, at *3; *Rodriguez*, 2009 WL 762203, at *9.

This finding is also consistent with *Olsen*, where the Supreme Court first extended standing to overnight guests, though not expressly as to the curtilage. *See* 495 U.S. at 99. The Court in *Olsen* noted that a "host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest." *Id.* The Court further noted "hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household." *Id.* Given that "hosts will more likely than not respect the privacy interests of their guests," the Undersigned finds it is objectively reasonable for an overnight guest to have an expectation of privacy as to individuals entering or exiting the curtilage. *See id.*

Moreover, given that Defendant spent time at the property, it is subjectively reasonable for Defendant to believe that the host would respect his privacy interests, including his interests in persons entering or exiting the apartment. *See id.* Indeed, the facts from the suppression hearing demonstrate that Defendant spent multiple nights at the apartment in the month preceding his arrest. (Tr. at 32). Additionally, Defendant had an ongoing sexual relationship with the primary tenant, Ms. McIntosh. (*See id.* at 16). During the evening in question,

Defendant slept in Ms. McIntosh's bed.  (*Id.* at 15, 30).  Further, Defendant testified that he went to see Rodjay, who also lived at the apartment, almost daily.  (*See id.* at 29).

Accordingly, the Undersigned finds that Defendant has both an objective and subjective expectation of privacy regarding people entering or exiting the curtilage.  *See Segura-Baltazar*, 448 F.3d at 1286 (finding that an individual has a legitimate expectation of privacy under the Fourth Amendment if he or she exhibits an actual expectation of privacy and the privacy expectation is one that society is prepared to recognize as reasonable).  Thus, the Undersigned finds that Defendant has a legitimate expectation of privacy on the curtilage of the duplex.  *See id.*  Defendant, therefore, has standing to contest the police action here.

Despite the finding as to standing, however, Defendant's primary argument is that law enforcement's illegal knock and talk produced the evidence Defendant now seeks to suppress. Nevertheless, as discussed in greater detail in Part III.B., *infra*, the Undersigned finds the actions of the police officers did not produce the contested evidence.  Suppression of the evidence is, therefore, not warranted here.  Thus, regardless of whether Defendant had standing to challenge the officers' entry on the curtilage, the ultimate conclusion in this case would not differ.

### 3.    Whether Defendant's Status as a Probationer Affects Standing

As a final matter, the Undersigned notes that probationers have a diminished expectation of privacy.  *See Owens*, 681 F.2d at 1367.  In fact, the Eleventh Circuit has held that "a probationer's Fourth Amendment right to be free from unreasonable searches and seizures is not violated by a condition of probation that permits warrantless searches of his person and property by probation supervisors and law enforcement officers."  *Id.* at 1368.

In this instance, however, the Government did not argue, and the evidence presented at the suppression hearing does not suggest, that warrantless searches were a part of Defendant's

conditions of probation for his crimes adjudicated in state court.  (*See* Gov. Ex. 8; Def. Ex. F).

Indeed, neither Order of Probation in either Government's Exhibit 8 or Defendant's Exhibit F

includes a provision for warrantless searches by law enforcement.  (*See id.*).  The Undersigned,

therefore, cannot find on the current record that Defendant's status as a probationer affects his

standing to contest these alleged violations.[4]

### 4.     Conclusion as to Standing

In sum, Defendant has standing as an overnight guest to contest the alleged Fourth

Amendment violations at 2991 Douglas Avenue, including the officers' actions in breaching the

curtilage to conduct a so-called "knock and talk."

### B.     Evidence Obtained from Defendant's Arrest

Having addressed standing, the Undersigned now addresses (1) whether law enforcement

violated Defendant's Fourth Amendment rights on August 9, 2017 at 2991 Douglas Avenue and

(2) whether the evidence should be suppressed.

### 1.     Whether the Knock and Talk Was Illegal

Defendant contends that the actions of law enforcement on August 9, 2017 constituted an

illegal "knock and talk."  (Doc. 20 at 7; Doc. 34 at 9; Tr. at 169).

For its part, the Government did not necessarily contest that the officers' actions

exceeded what is permitted in a knock and talk.  (*See* Tr. at 154).  Instead, the Government

argues that any perceived violation of the Fourth Amendment based on a trespass on the

curtilage of property did not actually "bear any fruit," meaning that the evidence should not be

suppressed here.  (*Id.*).

---

[4] As discussed in Part III.C., *infra*, however, Defendant's status as a probationer does affect
whether a violation occurred when the DNA sample was taken from him after his arrest.

The Fourth Amendment guarantees "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Maxi*, 886 F.3d at 1326 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  Additionally, "[a] home's curtilage, the private property immediately adjacent to a home, is entitled to the same protection against unreasonable search and seizure as the home itself." *Id.* (quoting *United States v. Noriega*, 676 F.3d 1252, 1262 (11th Cir. 2012)).  "Because the curtilage is a constitutionally protected space, the police must have an express or implied license to be there without a warrant." *Id.* (citing *Florida v. Jardines*, 569 U.S. 1, 7-8 (2013)).

A "knock and talk" involves the implied permission for the police to "approach a home and knock, precisely because that is no more than any private citizen might do." *Id.* (quoting *Jardines*, 569 U.S. at 8)).  Indeed, the Supreme Court has noted that this license is "implied from the habits of the country" similar to the implied license enjoyed by "solicitors, hawkers and peddlers of all kinds." *Id.* (citation omitted).  The implied license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.

Nevertheless, as the Supreme Court has noted, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." *Id.* at 9.  In *Florida v. Jardines*, for example, the Supreme Court held that police exceeded the scope of the implied license when they entered the curtilage with a drug-sniffing dog with the intent to "engage in canine forensic investigation." *Id.*  The Court noted that "[t]here is no customary invitation to do that." *Id.*  Indeed, the Court noted that "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with

a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Id.*

Similarly, in *Maxi*, the Eleventh Circuit held that officers violated the implied license in conducting a knock and talk. 886 F.3d at 1327. The court noted that "[t]he reasoning in *Jardines* is not limited to the specific facts of bringing a drug-sniffing dog up to the front porch." *Id.* Instead, the court noted that "[i]t extends to any police intrusion onto curtilage that exceeds the customary license extended to all, whether measured by officers' actions or their intent." *Id.* (citing *Jardines* 569 U.S. at 9-10, n.3). Indeed, the court noted that in *Jardines* "[i]t wasn't just that the officer walked a dog up to the front door, it was that he did so with the intent to gather evidence." *Id.* (citing *Jardines* 569 U.S. at 9). As a result, the court held that was "with equal force that the principles of *Jardines* do not invite an armed battalion into the yard to launch a raid" because "[s]uch a sight 'would inspire most of us to—well, call the police.'" *Id.* (citing *Jardines* 569 U.S. at 9).

In *Maxi*, the court found that "[n]o doubt, the officers here breached the curtilage of the duplex." *Id.* There, approximately ten officers ran to the duplex, "many going through a gate in the fence, with four or five approaching the door and the rest taking up tactical positions around the exterior." *Id.* The court found that the defendant "did not give the officers an express license to come into his yard." *Id.* Moreover, the court noted that "while the officers had a license 'implied from the habits of the country,' to approach the front door and knock, they did much more than that." *Id.* Specifically, the court noted that the officer's physical intrusion was not "geographically limited to the front door or a 'minor departure' from it." *Id.* (internal quotations and citation omitted). The court noted that that officers testified that they took tactical positions not only at the front door but also around the perimeter of the duplex. *Id.*

Further, the court found that the officers' intent in approaching the duplex was not that of an ordinary citizen. *Id.* As the testimony of the officers made clear, the court found that "the officers intended to secure the duplex and detain anyone they found inside, which is, of course, exactly what they did." *Id.* As a result, the court found that "[t]hat this encounter was not intended to be a casual, informational interview." *Id.* The court stated that its finding was "also supported by the fact that at least one officer had his gun drawn and in a 'low, ready position.'" *Id.* Thus, the court held that, as in *Jardines*, there is no customary invitation to do what the officers did. *Id.* (citing *Jardines*, 569 U.S. at 9).

After careful review of the parties' arguments, the Undersigned finds that the officers' actions in this case clearly exceeded the scope of the implied license. *See Jardines*, 569 U.S. at 9; *Maxi*, 886 F.3d at 1326-27. As the court in *Maxi* found, the principles of *Jardines* do not invite an armed battalion into the yard to launch a raid because "[s]uch a sight 'would inspire most of us to—well, call the police.'" *Id.* at 1327. That is essentially what the officers did in this case. As *Jardines* and *Maxi* make clear, officers could approach the front door and knock. *See Jardines*, 569 U.S. at 9; *Maxi*, 886 F.3d at 1326-27. The implied license allows officers to do as much. *See id.* Yet, as in *Maxi*, the officers' physical intrusion was not geographically limited to the front door or even a minor departure from it. *See* 886 F.3d at 1327.

Like the duplex in *Maxi*, the officers here breached the curtilage of the duplex at 2991 Douglas Avenue. *See id.* at 1326. Similar to *Maxi*, numerous officers entered through a gate and approached the apartment at the front and back doors. (Gov. Ex. at 1-3). Moreover, like *Maxi*, officers took up tactical positions around the exterior of the duplex with weapons drawn. *See Maxi*, 886 F.3d at 1326-27. Officer Birch testified that officers set up a perimeter around the

duplex.  (Tr. at 100).  Further, Officer Ross testified that officers displayed weapons as they went to the doors.  (*Id.* at 70).

Moreover, like *Maxi*, it is clear that the officers' intent in approaching the apartment was not that of an ordinary citizen.  *See* 886 F.3d at 1327.  For instance, Officer Birch loudly announced "[l]isten, man, we don't want to send the dog in there.  Just come out with your hands up . . .  Do it now."  (Gov. Ex. 2; Tr. at 83).  Officer Birch testified that telling the occupants that the police did not want to send in the dogs was a tactic to attempt to get the occupants out of the building.  (Tr. at 102-03).  Moreover, the video in evidence shows that officers announced that they were not leaving until the occupants exited the building.  (*See, e.g.*, Gov. Ex. 2; Tr. at 84).

Based on the testimony of the officers and the bodycam footage, it is clear that the officers intended to secure the apartment and detain anyone they found inside.  *See Maxi*, 886 F.3d at 1327.  Thus, like *Maxi*, the officers' encounter at the apartment was not intended to be a casual, informational interview with those persons inside.  *See id.*  As a result, similar to *Maxi*, the implied license does not extend to the actions taken by law enforcement.  *See id.* at 1326-27. There was no customary invitation to do what the officers did.  *See Jardines*, 569 U.S. at 9; *Maxi*, 886 F.3d at 1326-27.

Based upon the foregoing, the Undersigned finds the actions of law enforcement do not qualify as a valid "knock and talk."  *See Maxi*, 886 F.3d at 1326-27.  Thus, the Undersigned finds the actions of law enforcement violated the Fourth Amendment.

### 2.        Whether the Evidence Should Be Suppressed

Even though the officers did not conduct a valid knock and talk, that is not the end of the Court's inquiry.  *See Maxi*, 886 F.3d at 1327-28.  Indeed, "[t]he question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an

issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Id.* at 1327 (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).  In order for the exclusionary rule to apply, the violation must be the but-for cause of the evidence obtained.  *Hudson v. Michigan*, 547 U.S. 586, 592 (2006).

In *Maxi*, for example, despite the illegal knock and talk, the Eleventh Circuit found that "the constitutional violations of the officers did not result in the production of evidence."  *Maxi*, 886 F.3d at 1328.  Specifically, the court noted that "the violation was the manner in which the officers approached the house, not that they approached at all."  *Id.*  The court found that there was no evidence to suggest that anything would have turned out differently if the officers had completed a proper knock and talk.  *Id.*  There, the court noted that the defendant opened the door almost immediately after an officer knocked and seemed entirely unaware of the scene developing outside.  *Id.*  As a result, the court held that "[b]ecause the constitutional violations here did not produce the contested evidence, we conclude that exclusion is not the appropriate remedy."  *Id.*

In dicta, however, the court noted that some knock-and-talk violations could result in exclusion.  *Id.*  For instance, the court noted that if the defendant had "opened the door because he saw a phalanx of officers descending on his location; if he did so as a result of a show of authority by the officers outside; or if he otherwise changed his behavior in response to a demand made by the officers, we would have a different case."  *Id.*  Additionally, the court noted that, under *Jardines*, "if officers had found evidence in the yard or peered through windows as they took up positions around the house, that evidence would be subject to exclusion."  *Id.* (citing (citing *Jardines*, 569 U.S. at 9).  Because those were not the facts in *Maxi*, however, the court did not reach any such conclusion.  *Id.*

Here, Defendant argues that his case should be decided in line with the dicta in *Maxi* because he indeed exited the duplex due to the actions of officers.  (Tr. at 171).  Moreover, to the extent that it can be argued that he left the house based on the requests of Ms. McIntosh, Defendant argues that the officers used Ms. McIntosh as a tool to get him out of the duplex.  (*Id.* at 173-75).  Further, Defendant argues that the officers lied to Ms. McIntosh to get Defendant to come out of the house.  (*Id.* at 175).  As a result, Defendant argues that Ms. McIntosh was an agent of the Government, making her actions those of law enforcement.  (Doc. 34 at 5; Tr. at 186).

For its part, the Government argues that "there is simply no proof and no evidence here that [Defendant] submitted in any degree to the demands of officers to leave the house."  (Tr. at 154).  The Government points out that Defendant did not leave for over 15 minutes while officers were present.  (*Id.*).  Instead, the Government argues that Defendant's own testimony shows that he left the house because Rodjay's girlfriend, Till, asked him to do so.  (*Id.* at 156).  Moreover, the Government argues that Ms. McIntosh was not acting as a Government agent.  (*Id.* at 182).  Instead, the Government argues that she was trying to protect her son.  (*Id.*).

After careful review of the parties' arguments and the evidence presented at the suppression hearing, the Undersigned finds that, similar to *Maxi*, the knock and talk violation did not produce the contested evidence.  *See* 886 F.3d at 1327-28.  Here, the contested evidence that Defendant seeks to suppress resulted from Defendant coming outside of the duplex and being arrested.  Yet the Defendant did not come outside in response to the officers' actions.  Indeed, as noted by the Government, even though law enforcement had the duplex surrounded and repeatedly and loudly requested that the occupants inside exit the building, no one exited the residence based on the actions of law enforcement for over 15 minutes.

Instead, it is clear that Defendant came outside only in response to the actions of Ms. McIntosh and Till. The evidence – including the bodycam footage – and testimony at the suppression hearing shows that once Ms. McIntosh arrived, she requested that everyone inside the apartment come outside. (Gov. Ex. 3; Tr. at 121-25). Eventually, Defendant came outside. (Gov. Ex. 3; Tr. at 125). Moreover, at the suppression hearing, Defendant testified that he came outside in response to Till asking him to come outside as a result of Ms. McIntosh's request to the occupants. (Tr. at 40). Thus, the evidence shows that Defendant was eventually arrested, not based on the actions of law enforcement, but rather through the actions of Ms. McIntosh and Till. As a result, the actions of law enforcement are not the but-for cause of the contested evidence.

Additionally, although Defendant argues that this case mirrors the dicta in *Maxi*, the record does not show that Defendant "opened the door because he saw a phalanx of officers descending on his location," did "so as a result of a show of authority by the officers outside," or "otherwise changed his behavior in response to a demand made by the officers." *See Maxi*, 886 F.3d at 1327-28. If he had, this would be a different case. *See id.* Nevertheless, because the constitutional violations by law enforcement did not produce the contested evidence, exclusion is not the appropriate remedy. *See id.*

Furthermore, the Undersigned does not find persuasive Defendant's arguments that Ms. McIntosh was acting as an agent on behalf of law enforcement, thereby making her actions the functional equivalent of law enforcement. (Doc. 34 at 5; Tr. at 171-75). On this point, the Undersigned notes that "[a] search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Emile*, 618 F. App'x 953, 955 (11th Cir. 2015) (internal quotations omitted; quoting *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003)). To determine whether a private citizen acted as a

35

Government agent, courts consider "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Id.* (internal quotations omitted; quoting *Steiger*, 318 F.3d at 1045). Additionally, courts consider whether the Government "openly encouraged or cooperated in the search." *Id.* (internal quotations omitted; quoting *United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985)).

In this instance, the evidence from the suppression hearing does not support a finding that Ms. McIntosh or Till were acting as Government agents.

In reaching this conclusion, the Undersigned notes that Ms. McIntosh testified that law enforcement called her to come back to her apartment on August 9, 2017. (Tr. at 24). Nevertheless, the evidence from the suppression hearing does not show that police were actually successful in reaching Ms. McIntosh by phone. (*See, e.g.*, Gov. Ex. 3). In any event, Ms. McIntosh testified that she was coming back to her apartment anyway to get work clothes. (Tr. at 24).

More to the point, however, once Ms. McIntosh arrived at her apartment, the bodycam footage shows that she was not only trying to stay out of jail herself but also that she was trying to protect her son. (*See* Gov. Ex. 3; Tr. at 121-25). Importantly, she never gave officers permission to enter her apartment. (*See id.*). Additionally, the video shows that she mentioned her probation status to police and also told officers that she did not want to go to jail. (*Id.*). Likewise, the video shows that she took steps to protect her son. (*Id.*). She disclaimed that her son could have been the driver. (*Id.*). Almost immediately, she identified Defendant as the driver instead. (*Id.*). Moreover, the video in evidence is consistent with her testimony at the suppression hearing. (*See* Tr. at 16). At the hearing, Ms. McIntosh testified about her actions on

August 9, 2017, stating that "her son [had] just got out of jail. I was trying to stay out of jail."
(*Id.*). Thus, the record shows that she was trying to protect herself and her son, not trying to help
law enforcement. *See Emile*, 618 F. App'x at 955.

      As a final point regarding Ms. McIntosh, the Undersigned notes Defendant's argument
that the officers' created the need for her to protect her son because the officers lied that her son
had been the driver of the white Camry. (Tr. at 175). The Undersigned finds, however, that the
record does not support such a conclusion. Instead, for the reasons discussed above, the record
supports the conclusion that Ms. McIntosh's purpose in removing individuals from her apartment
was not only to protect her son, but also to avoid going to jail herself. Her self-interest in
avoiding jail appears independent from any misstatement or misrepresentation by the officers.
Accordingly, despite the misstatements or misrepresentations by the officers, the Undersigned
finds that Ms. McIntosh was not an agent of the Government. *See Emile*, 618 F. App'x at 955.

      Similarly, there is no testimony or other evidence that Till was acting as a Government
agent either. *See id.* Instead, it appears that she was acting at Ms. McIntosh's instruction to
remove people from the apartment. Because Ms. McIntosh was not an agent of the Government,
Till was not an agent either. *See id.*

      Accordingly, because Ms. McIntosh and Till were not acting as Government agents, the
police officers were not the but-for cause of the contested evidence. Instead, the contested
evidence resulted from the actions of Ms. McIntosh and Till.

      In sum, although law enforcement conducted an unconstitutional knock and talk at 2991
Douglas Avenue, the officers' conduct did not produce the contested evidence. Instead, the
record shows that Defendant voluntarily came out of the house only in response to requests from
Ms. McIntosh and Till, neither of whom were agents of the Government. Because the

constitutional violations by law enforcement did not produce the contested evidence, exclusion is not the appropriate remedy here.  *See Maxi*, 886 F.3d at 1327-28.  Accordingly, the evidence obtained by law enforcement as a result of Defendant's arrest at 2991 Douglas Avenue should not be suppressed on this basis.

      C.        **DNA Evidence**

In addition to the illegal knock and talk, however, Defendant independently contests the DNA evidence taken from him after this arrest on August 9, 2017.

Specifically, Defendant argues that the Government is required to obtain a search warrant or consent prior to taking a DNA sample unless the sample is for identification purposes.  (Doc. 20 at 5 (citing *Maryland v. King*, 569 U.S. 435, 446, 465 (2013))).  Defendant argues that, because the police sought the sample to compare it to DNA found on the gun, the seizure of his DNA was for investigative purposes and, thus, required a search warrant or consent.  (*Id.* at 7 (citing *United States v. Davis*, 65 F. Supp. 3d 1352, 1369-70 (M.D. Fla. 2014))).

For its part, the Government argues that, due to Defendant's status as an active probationer, law enforcement only needed "reasonable suspicion" to conduct the DNA buccal swab.  (Doc. 29 at 11 (citing *United States v. Knights*, 534 U.S. 112, 119 (2001); *United States v. Yuknavich*, 419 F.3d 1302, 1309 (11th Cir. 2005))).

A review of the cases cited by the parties – beginning with the Supreme Court and Eleventh Circuit precedent cited by the Government – is instructive.

The Government cites *United States v. Knights*, 534 U.S. 112, 119-22 (2001) in support of its position.  (Doc. 29 at 11).  In *Knights*, the Supreme Court held that a warrantless search pursuant to a probation condition and supported by reasonable suspicion satisfies the Fourth Amendment.  534 U.S. at 121.  The Court noted that "[t]he touchstone of the Fourth Amendment

is reasonableness." *Id.* at 118. The Court further stated that the reasonableness of a search is determined by a balancing test where the Court assesses "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 118-19 (citation omitted). The Court reasoned that the defendant's "status as a probationer subject to a search condition inform[ed] both sides of that balance." *Id.* at 119. Indeed, the Court stated that "[i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id.* (internal quotations and citations omitted).

Applying this reasoning, the Court concluded that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 121. Accordingly, the Court reversed and remanded because the warrantless search at issue was conducted pursuant to a probation condition and supported by reasonable suspicion, thereby satisfying the Fourth Amendment's reasonableness requirement. *Id.* at 122.

The Government also cites *United States v. Yuknavich*, in which the Eleventh Circuit extended *Knights* to situations where warrantless search conditions are not part of a defendant's probation. 419 F.3d at 1309-11. In *Yuknavich*, the defendant was a sex offender whose internet usage was restricted as part of his probation. *Id.* at 1304-05. The defendant was detained for violating this condition but later challenged the probation officers' warrantless search of his computer as unconstitutional. *Id.* at 1307-08. The court, however, found that the search of the defendant's computer passed muster under the balancing test set forth in *Knights. Id.* at 1308.

Specifically, even though there was no search condition as part of the probation, the court stated that "the presence of a search condition is but one 'salient circumstance' to consider." *Id.* at 1309 (citations omitted).  The court noted that the defendant's internet usage was explicitly restricted to "work related purposes" during "work hours."  *Id.* at 1310.  The court found that, given this limitation, the defendant:

> should have always been prepared for three questions:  Do you have a computer?  If yes, can you access the Internet?  If yes, what are you doing on-line?  Not only should he have been prepared to answer those questions, but he also should have been prepared for the officers to conduct their own research to find the answers.  If the Internet restriction did not provide the officers with a greater ability to examine the life of [the defendant], then there would be little reason for it to exist.

*Id.* at 1310.  Thus, the Eleventh Circuit found that no more than reasonable suspicion was needed for the search.  *Id.* at 1311.

The court further found that reasonable suspicion existed to search the defendant's computer.  *Id.* The court noted that the officers knew of the defendant's prior convictions and restriction on internet usage.  *Id.*  Additionally, the officers knew that the defendant had twice accessed the internet outside of his home.  *Id.*  Further, the defendant appeared nervous, and he had delayed in answering the door when probation officers arrived.  *Id.*  Finally, the court noted that a modem was connected to one of his computers.  *Id.*

For his part, Defendant relies on a previous decision of this Court, *United States v. Davis*, 65 F. Supp. 3d 1352, 1369-70 (M.D. Fla. 2014) (adopting and incorporating magistrate judge's report and recommendation).  (Doc. 20 at 7).  In *Davis*, United States District Judge Sheri Polster Chappell granted the defendant's motion in part as to his request to suppress DNA evidence.  65 F. Supp. 3d at 1359.  Similar to the instant case, officers took a sample of the defendant's DNA for the purpose of comparing it with DNA on the firearm seized from the defendant's vehicle.  *Id.* at 1369-70.  Although the Court noted that, under the Supreme Court's decision in *Maryland*

*v. King*, 569 U.S. 435 (2013) and Fla. Stat. § 943.325, officers could take a DNA sample for identification purposes, the Court found that the officers violated the defendant's Fourth Amendment rights as well as the Florida statute by taking the sample in furtherance of investigating defendant's possession of the firearm.  *Id.*

Defendant also relies upon *United States v. Ponce*, No. 2:16-cr-139-FtM-99MRM, 2017 WL 3251494, at *4-7 (M.D. Fla. July 31, 2017).  (Doc. 34 at 8).  In *Ponce*, Judge Chappell denied the defendant's motion to suppress regarding the Government's use of GPS tracking on the defendant's cell phone.  2017 WL 3251494, at *7.  The defendant argued that a warrant was needed to use GPS location tracking on his phone notwithstanding his status as a probationer.  *Id.* at *4.  Judge Chappell noted that "[i]mplied in [the defendant's] argument is that he had a reasonable expectation of privacy in his location."  *Id.*  As in the instant case, the Government in *Ponce* also relied on *Knights* and *Yuknavich* to argue that the defendant did not enjoy any such privacy because he was on probation.  *Id.*  The Government argued that it needed only reasonable suspicion – not probable cause – to locate the defendant using GPS tracking on his phone because defendant was subject to a probation condition requiring him to disclose his location upon request.  *Id.*

Judge Chappell ultimately found that the defendant's fugitive status – not his probation status – was determinative of the suppression issues and denied the motion to suppress on that ground.  *Id.* at *5.  Nevertheless, as to the Defendant's probation status, Judge Chappell commented that "[t]he Court is hard pressed to see how [the defendant's] probation limitations meant he should have been prepared for officers to track his whereabouts at any given time through electronic surveillance."  *Id.*  Even though, like *Yuknavich*, the defendant's "probation conditions did not include warrantless searches," Judge Chappell found the rationale used by the

Eleventh Circuit in *Yuknavich* inapplicable. *Id.* at *5. Specifically, Judge Chappell noted that the defendant's probation conditions included "permitting his probation officer to visit his home, remaining in a specified place, answering the officer's questions truthfully, not carrying a firearm, and refraining from drug use." *Id.* Judge Chappell found that the search of the defendant's cell phone was "wholly detached from those conditions." *Id.* Distinguishing *Yuknavich*, Judge Chappell found that there was nothing implicit in the defendant's probation terms that would have prepared him for a warrantless search of his cell phone. *Id.* Judge Chappell further found that it was difficult to see how the defendant's "probation limitations meant he should have been prepared for officers to track his whereabouts at any given time through electronic surveillance." *Id.*

After a careful review of the parties' arguments and the evidence presented at the suppression hearing, the Undersigned finds that Defendant's Fourth Amendment rights were violated in this case by the warrantless DNA buccal swab even though he was probationer. Both Officer Birch and Officer Sanders testified that the purpose of the DNA sample was not to identify Defendant, but rather to investigate whether the DNA on the gun matched Defendant's DNA. (Tr. at 106-07, 136). This testimony demonstrates unequivocally that the purpose of the DNA sample was for investigative purposes. Consistent with *Davis*, therefore, law enforcement would generally need a warrant or consent for such a search. *See* 65 F. Supp. 3d at 1369-70. The police here had neither. (*See* Tr. at 106-07, 136).

Although Defendant's probationer status distinguishes this case somewhat from *Davis*, and although *Knights* and *Yuknavich* make clear that probationers do not enjoy the absolute liberty to which everyday citizens are entitled, the Undersigned finds that Defendant's

42

probationer status in this case did not serve to justify a warrantless search of his body to obtain a buccal DNA sample.

The Government argues that, similar to *Yuknavich*, the intrusion into Defendant's person "was directly related to uncovering something that would have been a direct violation of his probation and is specifically enumerated as a condition of his probation." (Tr. at 168). According to the Government, one of Defendant's conditions of probation for his prior offenses of being a felon in possession of a firearm was that Defendant shall "not possess, carry or own any firearm. You will not possess, carry, or own any weapon without first procuring the consent of your officer." (Gov. Ex. 8; Def. Ex. F). The Government argues that the DNA buccal swab was directly related to this condition of Defendant's probation and, thus, was "not the type of wholly detached search that Judge Chappell cautioned against in *Ponce*." (Tr. at 168).

The Undersigned disagrees. Although Defendant was a probationer previously convicted of being a felon in possession of a firearm, none of Defendant's probation conditions explicitly or implicitly placed him on notice that he would be subjected to either (1) a warrantless DNA search or (2) recurring DNA samples. Warrantless searches of any kind are not a part of Defendant's conditions of probation. (*See* Gov. Ex. 8; Def. Ex. F). Neither Order of Probation introduced into evidence at the suppression hearing includes such a provision. (*See* Gov. Ex. 8 and Def. Ex. F). Although the Orders of Probation indicate that Defendant was required to "submit a DNA sample, as directed by your officer, for DNA analysis as prescribed in [Fla Stat. §§ 943.325 and 948.014]," the Orders do not put Defendant on notice that he would be subjected to recurring DNA sample collections. (*See* Gov. Ex. 8 and Def. Ex. F). Similar to *Ponce*, therefore, the rationale used by the Eleventh Circuit in *Yuknavich* has no application here and does not support the Government's position. *See Ponce*, 2017 WL 3251494, at *5.

The Undersigned is not persuaded by the Government's implied analogy of the probation restriction in *Yuknavich* to the Defendant's probation restriction in this case.  In *Yuknavich*, the defendant's internet use was restricted as a condition of his probation.  *See* 419 F.3d at 1304, 1310.  The officers needed to be able to search Defendant's computer to determine the defendant's compliance with his internet restrictions.  *See id.* at 1310.  Specifically, the officers needed to be able to search the computer to determine whether the defendant used the computer and the internet to access contraband—*i.e.*, child pornography.  *See id.*  The officers' search revealed that he had accessed such contraband, in violation of his probation conditions.  *See id.*at 1310-11.

In this case, probation conditions prohibited the Defendant from possessing, carrying, or owning any firearm.  The firearm itself was the contraband, like the child pornography in *Yuknavich*.  Unlike *Yuknavich*, however, the search that occurred here was not a search for a firearm in Defendant's possession, on his person, or within his ownership.  The officers already had custody of the firearm, having taken it from within the stolen vehicle.  Instead, the search challenged here was an invasion of the Defendant's body to collect a buccal DNA sample for the investigative purpose of matching his DNA to DNA found on the firearm.  If the search at issue in this case had been a search of his car or his home to look for a firearm the Defendant was not allowed to have, then perhaps the analogy to *Yuknavich* would be stronger.  As it stands, however, the Undersigned finds that the analogy to *Yuknavich* is too attenuated to pass muster.

Moreover, the Undersigned has not found, and the Government has not cited to, any court decision in which a court has applied *Yuknavich* in the manner the Government seeks to apply it here—that is, to justify on "reasonable suspicion" grounds the warrantless seizure of DNA

evidence from a probationer's person for the investigative purpose of matching that DNA to DNA found on a firearm the probationer was not allowed to possess, carry, or own.

Accordingly, although Defendant was restricted from possessing firearms and was instructed to give a DNA sample as part of the conditions of his probation, much like *Ponce*, the Undersigned is hard pressed to see how Defendant's probation conditions prepared him for officers to take his DNA sample for investigating whether he was a felon in possession of a firearm. *See* 2017 WL 3251494 at *5. Instead, the Undersigned finds that the DNA buccal swab of Defendant by police was wholly detached from Defendant's probation conditions. *See id.*

Because the probation conditions are wholly detached from the search conducted by police, consistent with the reasoning in *Davis*, the Undersigned concludes that the police officers needed either a warrant or consent to conduct the DNA buccal swab. *See* 65 F. Supp. 3d at 1369-70. Because the police had neither, the Undersigned finds that the DNA sample violated Defendant's Fourth Amendment rights. *See id.* Similar to *Davis*, therefore, suppression of the evidence is warranted here. *See id.* Accordingly, the Court should grant Defendant's Motion to Suppress on this ground and suppress the DNA evidence obtained as a result of the DNA buccal swab taken by police during their interview with Defendant. *See id.*

## CONCLUSION

For the reasons set forth above, the Undersigned **RESPECTFULLY RECOMMENDS** that:

1) Defendant's Motion for Pre-Trial Suppression Hearing (Doc. 20) be **GRANTED IN PART** and **DENIED IN PART**.

2) The DNA evidence obtained by officers during Defendant's interview with police be suppressed.

3)   This action proceed to trial.

Respectfully recommended in Chambers in Fort Myers, Florida on July 30, 2018.


_____

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.


Copies furnished to:

Counsel of Record
Unrepresented Parties