NITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION


UNITED STATES OF AMERICA

VS.                         CASE NO: 2:18-cr-20-FtM-29MRM

MIGUEL MCSWAIN

_____

**OPINION AND ORDER**

On July 30, 2018, United States Magistrate Judge Mac R. McCoy submitted a Report and Recommendation (Doc. #52) to the Court recommending that Defendant's Motion to Suppress Evidence (Doc. #20) be granted in part and denied in part. The United States' Objections (Doc. #60) and defendant's Objections (Doc. #61) were both filed on August 27, 2018. The undersigned heard oral argument on October 2, 2018. On October 5, 2018, with the permission of the Court, the United States filed a Supplemental Objection (Doc. #67) and defendant filed a Supplemental Briefing on Suppression of Client Identification (Doc. #68). The United States' Response In Opposition to Defendant's Supplement Briefing (Doc. #72) was filed on October 19, 2018.

For the reasons set forth below, the Court accepts in part and rejects in part the Report and Recommendation; sustains in part and overrules in part defendant's objections; and sustains in part and overrules in part the United States' objections.

Defendant's Motion to Suppress Evidence (Doc. #20) is granted in part as set forth below, and is otherwise denied.

## I.

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject or modify the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Powell, 628 F.3d 1254, 1256 (11th Cir. 2010). A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). See also United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.1 (11th Cir. 2009). This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party." Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990)(quoting H.R. Rep. No. 94-1609, 94th Cong., 2nd Sess, reprinted in 1976 U.S.C.C.A.N. 6162, 6163). The district judge reviews legal conclusions *de novo*, even in the absence of an objection. See Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 604 (11th Cir. 1994). A district court may not reject the credibility determinations of a magistrate judge without personally rehearing disputed testimony from the witness. Powell, 628 F.3d at 1256-58.

The Court will discuss the sequence of events, its factual findings as to those events, and its legal conclusions. The Court accepts and adopts the "Summary of the Evidence" and the "Factual Summary" set forth in the Report and Recommendation (Doc. #52, pp. 1-9), as supplemented by the additional facts set forth below. Other portions of the Report and Recommendation are discussed separately.

## A. Traffic Violation and Abbreviated Pursuit of Camry

On August 9, 2017, Officer Zachary Ross and Officer Brandon Birch, members of the Gang Suppression Unit, were on patrol together in a marked City of Fort Myers police car. At about 12:30 p.m., the officers observed a white Toyota Camry fail to stop for a stop sign as it made a right-hand turn. Both officers had a clear look at the driver of this vehicle, but did not recognize the person. The officers attempted to make a traffic stop, but the vehicle accelerated at a high rate of speed. After a 20-30 second chase with lights and siren activated, the officers terminated pursuit for safety reasons. Both officers had seen the vehicle make a turn some distance ahead, so the officers canvased that area looking for the vehicle. Within less than a minute, the officers located the vehicle parked in the driveway at 2991 Douglas Avenue, a residential duplex. No one was in or near the vehicle, and the officers did not see the driver. Officer Birch was

broadcasting their activities to other members of the Gang Suppression Unit.

Defendant does not allege any violation of his rights based on this conduct, and of course, there was none.

**B. Officers' Entry Onto Property At 2291 Douglas Avenue; Seizure of Firearm From Camry**

Officers Ross and Birch parked their police vehicle in the public street, got out, walked onto the driveway of 2291 Douglas Avenue, and approached the parked Camry to look for an occupant. The Camry was parked in the duplex's driveway, which was adjacent to an enclosed side yard shared by the two units of the duplex. Officer Ross opened the Camry's door, looked into the interior of the vehicle, and observed a firearm located between the driver's seat and the glovebox. Officer Ross seized the firearm from the interior of the vehicle, and Officer Birch photographed the firearm and secured it. Because no one was seen at or near the Camry, other officers were called, including a K-9 unit. Three other officers (canine Officer William Schulte, Officer Jari Sanders, and Officer Walter Mickey) arrived at the property. An officer called the police dispatcher about the Camry, and was informed that the vehicle had been reported stolen.

**(1) Fourth Amendment Violations**

The entry onto the private property at 2291 Douglas Avenue, the opening of the Camry door, the observation of the firearm in

the vehicle, and the seizure of the firearm from the interior of
the vehicle were illegal.  Collins v. Virginia, 138 S. Ct. 1663,
1671 (2018).

**(2)  Defendant's Standing To Challenge This Police Conduct**

Defendant McSwain, however, does not challenge this police
conduct, and indeed has no right to do so.  It is undisputed that
defendant had no legitimate expectation of privacy in the Camry or
its contents, i.e., he has no "standing" to challenge the police
conduct relating to the vehicle.

In the Fourth Amendment context, "standing" is a concept which
"is not distinct from the merits and 'is more properly subsumed
under substantive Fourth Amendment doctrine.'"  Byrd v. United
States, 138 S. Ct. 1518, 1530 (2018) (quoting Rakas v Illinois,
439 U.S. 128, 139 (1978)).  "The concept of standing in Fourth
Amendment cases can be a useful shorthand for capturing the idea
that a person must have a cognizable Fourth Amendment interest in
the place searched before seeking relief for an unconstitutional
search. . . ."  Byrd, 138 S. Ct. at 1530.  A cognizable Fourth
Amendment interest requires that defendant have a personal
legitimate expectation of privacy in the item or area searched or
seized.  Byrd, 138 S. Ct. at 1526; Rakas, 439 U.S. at 144 n.12.
The Court adopts the general legal principles set forth in the
Report and Recommendation at Doc. #52, pp. 10-11.

Defendant told the officers at the scene that he had not been in the Camry, and testified at the suppression hearing that he was not the driver of that vehicle.  Despite the Magistrate Judge's finding to the contrary, defendant continues to maintain that position.  (Doc. #68, p.5, n.2.)  Additionally, the Camry had been stolen, and defendant asserts no interest in the vehicle or its contents.  Further, being charged with possession of the firearm which had been found in the vehicle is insufficient to create a reasonable expectation of privacy and confer standing.  Rakas, 439 U.S. at 133-34 ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); Alderman v. United States, 394 U.S. 165, 174 (1969).  Thus, even though this police conduct was unlawful, it did not infringe on *defendant's* Fourth Amendment rights.  Therefore, the firearm and photographs of the firearm located in the vehicle are not subject to suppression.

### C. Officers' Entry Into Shared Side Yard And Approach to Unit A; Compelled Exit of Occupants; Identification of Defendant

Officers determined from the neighbor in Unit B that the Camry belonged to the people in Unit A; that Rodjay Jackson, a/k/a Gator (hereinafter Rodjay) lived in Unit A; and that Rodjay was not in Unit B.  Officer Ross stated at the scene that there was a good

chance Rodjay was in Unit A of the duplex. While remaining on the property outside the gated area, officers pulled up Rodjay's image from the Sheriff's Office warrants database. After viewing the picture, Officer Ross stated multiple times that he was 100% certain that Rodjay had been the driver of the Camry. Officer Birch, however, did not believe from the photo that Rodjay was the person driving the Camry. Officer Birch was previously familiar with Rodjay, and believed Rodjay was not the driver. Officer Birch told other officers at the scene that they could identify the driver if they saw him because they had obtained a good look at the driver.

Officers then opened a gate to the side yard shared by both units of the duplex, approached the front and back doors of Unit A, and attempted to get Rodjay and the other occupants to leave the duplex. Among other things, the officers, with weapons drawn, set up a perimeter around the duplex, loudly knocked on the door and told the occupants the house was surrounded, and loudly requested that Rodjay come out with his hands up because the officers did not want to "send the dog in there." (Doc. #49, p. 83.) One officer announced that the officers would not leave until Rodjay came out. Officer Birch asked Officer Newberry to bring "the tool" because they were going to breach the door. (Id., p. 85.) Officers remained just outside the front and back doors for the entire period until first Rodjay, and then defendant,

eventually exited the unit. During this time period, four more police officers arrived at the property (for a total of at least nine officers). Officers repeatedly told Rodjay to come out of the duplex. It is clear, and undisputed by the officers, that they were attempting to get the occupants of Unit A to exit the building because, with the exception of Officer Birch, they believed Rodjay had been the driver of the Camry.

Officers had learned that Elizabeth McIntosh, who was personally known to some of the officers, was the owner of Unit A. Officers unsuccessfully attempted to contact her for the key so she could open the door and they would not have to smash the door, because the officers were "coming in." (Id., p. 56.) Ms. McIntosh was identified as Rodjay's mother, and both were identified as convicted felons.

About fifteen minutes after the first officers arrived, and while the officers were still trying to get the occupants out of Unit A, Ms. McIntosh arrived to get some work clothes from her residence. Ms. McIntosh described the duplex as being "surrounded" by officers. Officer Sanders falsely told Ms. McIntosh that Rodjay had been driving the stolen vehicle and that officers watched him run from it. Ms. McIntosh did not believe this, and told the officers that the driver was someone else in the apartment. Ms. McIntosh also told the officers that she was on probation and did not want to go to jail.

Officer Birch again told Rodjay to open the door because his mother was present and was going to open the door for police, and that the "gig's up." Ms. McIntosh called the occupants inside the apartment on her cell phone, and loudly instructed Till (Rodjay's girlfriend) to open the door. The door was eventually opened, Till and Rodjay came out together, and Rodjay was handcuffed. Ms. McIntosh told the officers that someone else was inside the unit, and Officer Sanders told Ms. McIntosh to tell the person to come out. Ms. McIntosh told Till to tell defendant to come outside; Till went back inside the unit and did so, and defendant came out of the unit. No officer ever crossed the threshold of the door, entered the unit, or searched inside the unit.

Rodjay was briefly detained while handcuffed, but the officers quickly determined that he was not the person they saw driving the Camry. When defendant exited the unit, Officers Ross and Birch identified him as the Camry's driver, and defendant was arrested and handcuffed. Officer Ross was now sure defendant (not Rodjay) had been the driver, and felt he had been misled by the hair depicted in Rodjay's booking photograph. Once Officer Ross saw defendant in person, he immediately had no doubt that defendant had been the driver. Officer Birch told defendant he was going to jail because he had been in the Camry, and defendant responded that the was not in the car at all. Defendant was arrested for

fleeing and eluding and possession of a firearm, and taken to the police station.

**(1)  Fourth Amendment Violation**

It is undisputed that the officers had no search warrant. Defendant asserts that the officers' approach to Unit A and their subsequent conduct violated the "knock and talk" exception to the warrant requirement of the Fourth Amendment.  As the Report and Recommendation stated, the government did not necessarily contest this point, but argued that no evidence should be suppressed under the exclusionary rule.  (Doc. #52, p. 28.)

The "knock and talk" exception allows officers to "do no more than any private citizen might do."  <u>Kentucky v. King</u>, 563 U.S. 452, 469 (2011).  Police have an owner's implied permission to "approach the home" and knock as long as the scope of the activity is limited to the usual purpose of such citizen conduct.  <u>Florida v. Jardines</u>, 569 U.S. 1, 8 (2013); <u>United States v. Maxi</u>, 886 F.3d 1318, 1326-28 (11th Cir. 2018).  There is an implicit license to "approach a home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  <u>Jardines</u>, 569 U.S. at 8.  The Court adopts the legal principles set forth in the Report and Recommendation at Doc. #52, pp. 29-31.

The Report and Recommendation found that the conduct of the officers clearly exceeded the scope of a proper knock and talk

encounter, and violated the Fourth Amendment. (Doc. #52, pp. 31-32.) The Report and Recommendation found that the officers were essentially "an armed battalion" which "launch[ed] a raid" on Unit A. (Id., p. 31.) At oral argument before the undersigned, counsel for the United States acknowledged that the police conduct was not within the proper parameters of the knock and talk exception, and did violate the Fourth Amendment before defendant's exit. (Doc. #73, p. 40.) The Court fully agrees with and adopts the conclusion of the Report and Recommendation that the officers' conduct clearly exceeded the proper scope of a knock and talk encounter and violated the Fourth Amendment.

**(2)  Defendant's Standing to Challenge Police Conduct**

While both parties now agree, and the Court concurs, that a Fourth Amendment violation occurred, the more problematic issue is whether defendant has standing to challenge this police conduct. The Court finds that defendant has standing to challenge the police conduct in and near the areas of ingress and egress of Unit A, regardless of his status as an overnight guest. The Court declines to accept the more expansive standing recommended by the Report and Recommendation, or its reliance on defendant's status as an overnight guest.

The Report and Recommendation essentially found that defendant had been an overnight guest in Unit A on the night of August 8, 2017; had left Unit A sometime the next morning; was

driving the Camry the next afternoon; fled from the police while driving the Camry; and had returned to Unit A and entered it shortly before the arrival of the police. (Doc. #52, pp. 12-19.) The Report and Recommendation found that defendant's status as an overnight guest on August 8 gave him standing to challenge the police conduct in the shared side yard of the duplex, which it refers to as "the curtilage," at the time of his August 9 arrest. (Doc. #52, p. 19.) See also id. at 25 ("Defendant has standing to contest entry on the curtilage due to his status as an overnight guest."). "Defendant has a legitimate expectation of privacy on the curtilage of the duplex" and "therefore, has standing to contest the police action here." (Id. at 27.) The Report and Recommendation made this determination despite recognizing that (1) defendant offered no argument that he had a legitimate expectation of privacy in the shared side yard, (2) defense counsel specifically stated at the suppression hearing that defendant was not asserting that he had a reasonable expectation of privacy in the shared yard (but only at and near the ingress and egress areas of the unit), and (3) there was an absence of any clear binding authority on the issue of defendant's continued status as an overnight guest after leaving and returning to a premise. (Id.)

The Court finds that defendant has standing to challenge the police conduct at and near the ingress/egress areas of Unit A, regardless of whether his status as an overnight guest continued

through the time of his arrest.  As a result, and as discussed below, the Court finds that it is unnecessary to determine whether defendant maintained his status as an overnight guest through the time of his arrest, or whether he has standing as to other areas which may be considered curtilage.  The Court rejects those portions of the Report and Recommendation which find standing to challenge conduct beyond the areas of ingress/egress of Unit A.

The Court accepts the credibility findings set forth in the Report and Recommendation, and agrees with the factual finding that defendant was an overnight guest at Unit A on August 8, 2017. A defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Minnesota v. Olson, 495 U.S. 91, 96-97 (1990).  A reasonable expectation of privacy in a home has been extended to include its curtilage, i.e., the area "immediately surrounding and associated with the home." Florida v. Jardines, 569 U.S. 1, 6-7 (2013). See also Collins v. Virginia, 138 S. Ct. 1663, 1670-71 (2018); United States v. Dunn, 480 U.S. 294, 300-03 (1987).

It is not clear that defendant's status as an overnight guest continued after he left Unit A and returned some time later but neither the parties nor the Report and Recommendation cite any binding authority on this issue, and the Court need not resolve the issue in order to resolve this case.  The Court assumes for

purposes of the motion that defendant's status as an overnight guest did <u>not</u> continue after he left the unit, even though he later returned. The Court therefore declines to accept the Report and Recommendation's determination to the contrary at Doc. #52, pp. 15-19. Regardless, defendant has standing to challenge the conduct of the officers at and near the areas of ingress and egress of Unit A – the only areas to which defendant has ever claimed a legitimate expectation of privacy.

The police conduct at and near the areas of ingress and egress of Unit A may be challenged by defendant because it directly affected his own person, regardless of whether he then retained the status as an overnight guest. The conduct of the police caused defendant to exit a residential unit so officers could look at him and, having done so, arrest him. Whether viewed as a search[1], a seizure[2], or both, such conduct may clearly be challenged by the person who is directly impacted by it. Thus, for example, a mere passenger of a vehicle normally lacks standing to challenge the *search* of the vehicle, <u>Rakas</u>, 439 U.S. at 148-49; <u>United States v.</u>

---

[1] A search occurs when an officer moves an object in order to obtain a closer view of it. <u>Arizona v. Hicks</u>, 480 U.S. 321, 324 (1987).

[2] "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority' terminates or restrains his freedom of movement." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007).

Dixon, 901 F.3d 1322, 1338-39 (11th Cir. 2018), but has standing to challenge the stop of the vehicle because the stop directly impacts the passenger's own person. Brendlin v. California, 551 U.S. 249 (2007). Similarly, while a mere passenger generally may not challenge the search of the vehicle, he may challenge the search of his own property which is within the vehicle. United States v. Barber, 777 F.3d 1303, 1305 (11th Cir. 2015); United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990).

Here, the actions of the police caused defendant to exit the unit, which resulted in observation of him by the officers, their determination that he had been the driver of the Camry, and his arrest. Thus, defendant has standing to challenge the police conduct at and near the areas of ingress and egress of Unit A.[3]

**(3)  Whether Evidence Should Be Suppressed**

The Report and Recommendation found that despite the Fourth Amendment violation, and defendant's standing to challenge the police conduct, suppression of evidence was not required because the exclusionary rule did not apply. (Doc. #52, pp. 33-38.) The Report and Recommendation found that "[i]n order for the exclusionary rule to apply, the violation must be the but-for cause

_____

[3] Although the Court declines to accept the Report and Recommendation's standing analysis at Doc. #52, pp. 19-27, the Court agrees, and therefore accepts and adopts, the Report and Recommendation's determination that defendant's status as a probationer does not undermine his standing as to the areas in and near the ingress and egress of Unit A. (Doc. #52, pp. 27-28.)

of the evidence obtained. <u>Hudson v. Michigan</u>, 547 U.S. 586, 592 (2006)." (Doc. #52, p. 33.)  The Report and Recommendation further found that the knock and talk violation "did not produce the contested evidence" because "defendant did not come outside in response to the officers' actions."  (<u>Id.</u> at 34.)  Rather, the Report and Recommendation found "it is clear that Defendant came outside only in response to the actions of Ms. McIntosh and Till." (<u>Id.</u> at 35.)  "Thus, the evidence shows that Defendant was eventually arrested, not based on the actions of law enforcement, but rather through the actions of Ms. McIntosh and Till.  As a result, the actions of law enforcement are not the but-for cause of the contested evidence." (<u>Id.</u>)  The Report and Recommendation further found that neither Ms. McIntosh or Till were acting as government agents.  (<u>Id.</u> at 35-36.)

The Court declines to accept the Report and Recommendation's determination that the exclusionary rule did not apply to the facts of this case.  Rather, the Court finds that the violations of the Fourth Amendment by the officers were the but-for cause of defendant's exit from Unit A, and that the exclusionary rule requires suppression of certain evidence.

**(a)  Exclusionary Rule**

Ordinarily, evidence obtained in violation of an individual's rights under the Fourth Amendment "may not be used by the government in a subsequent criminal prosecution."   <u>United States</u>

v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002).  This exclusionary
rule is a judicially created remedy designed to deter future Fourth
Amendment violations.   Utah v. Strieff, 136 S. Ct. 2056, 2061
(2016); Davis v. United States, 564 U.S. 229, 236-37 (2011).  "The
exclusionary rule encompasses both the primary evidence obtained
as a direct result of an illegal search or seizure and, . . .
evidence later discovered and found to be derivative of an
illegality, the so-called 'fruit of the poisonous tree.'"
Strieff, 136 S. Ct. at 2061 (citation omitted); Davis, 564 U.S. at
232.

But the existence of a Fourth Amendment violation and
defendant's standing to assert the violation "does not necessarily
mean that the exclusionary rule applies."   Herring v. United
States, 555 U.S. 135, 140 (2009).  See also Maxi, 886 F.3d at
1327-28.  Even when the Fourth Amendment violation is the "but-
for" cause of obtaining evidence, it is "applicable only . . .
where its deterrence benefits outweigh its substantial social
costs."  Hudson v. Michigan, 547 U.S. 586, 591-92 (2006 (citation
omitted)).  See also Strieff, 136 S. Ct. at 2059 ("even when there
is a Fourth Amendment violation, this exclusionary rule does not
apply when the costs of exclusion outweigh its deterrent
benefits.")  "Suppression of evidence . . . has always been our
last resort, not our first impulse."  Strieff, 136 S. Ct. at 2061.

**(b)   Police Conduct Was But-For Cause**

The Report and Recommendation correctly stated that the exclusionary rule applies only if the Fourth Amendment violation is the but-for cause of obtaining the evidence. Hudson, 547 U.S. at 592 ("Our cases show that but-for causality is only a necessary, not a sufficient condition for suppression.")  The Fourth Amendment violation in Hudson - failing to comply with the knock and announce rule in the execution of a search warrant – was not the but-for cause because the officers would have executed the warrant and found the evidence whether or not the announcement requirement was satisfied. Id. See also Maxi, 886 F.3d at 1328. The same cannot be said here because the constitutional violations of the officers resulted in the production of evidence not otherwise available.

Had the officers done what the law required, they would have approached Unit A, knocked, waited a reasonable time for a response, and when none came, left.  That is obviously not what the officers did in this case.  Without a search warrant or any other legal authority, and without probable cause as to defendant McSwain, the officers essentially laid siege to Unit A until all occupants exited the premises.  To accomplish their stated intent of compelling Rodjay and all other occupants to exit Unit A, the officers utilized a number of strategies:  Armed officers surrounded the property, particularly the areas of ingress and

egress; officers loudly knocked on the door and demanded the occupants exit the premises; officers threatened to send a dog into the unit if the occupants failed to exit; an officer falsely told Ms. McIntosh that her son had been seen driving the stolen Camry and had been seen leaving the Camry; and an officer told Ms. McIntosh to have Rodjay exit the premises so they would not have to send a dog in or use a tool to break in. The fact that Ms. McIntosh, a person on probation who had been lied to by an officer as to her son's conduct, acquiesced to the officer's request does not relieve the officers from being the "but for" cause of the conduct. The Fourth Amendment is not nearly so anemic as to allow the conduct in this case to summarily evade consideration of suppression of evidence as a deterrence to future misconduct.

**(c) Applicability of Exclusionary Rule**

Whether the exclusionary rule applies depends on a cost-benefit analysis that takes into account the deterrent value served by suppression and "the substantial social costs generated by the rule." <u>Davis</u>, 564 U.S. at 237. "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." <u>Id.</u>

> [T]he deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. [ ] When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting

costs. [ ] But when the police act with an
objectively "reasonable good-faith belief"
that their conduct is lawful, [ ] or when their
conduct involves only simple, "isolated"
negligence, [ ] the "'deterrence rationale
loses much of its force,'" and exclusion
cannot "pay its way."

Davis, 564 U.S. at 238 (internal citations omitted).

To trigger the exclusionary rule, police
conduct must be sufficiently deliberate that
exclusion can meaningfully deter it, and
sufficiently culpable that such deterrence is
worth the price paid by the justice system. As
laid out in our cases, the exclusionary rule
serves to deter deliberate, reckless, or
grossly negligent conduct, or in some
circumstances recurring or systemic
negligence.

Herring, 555 U.S. at 144.

Here, the conduct of the officers at Unit A rose to this
level. The conduct was clearly deliberate, and therefore
exclusion of evidence can meaningfully serve as a deterrent.
Additionally, because the conduct was abundantly culpable from the
time of the entry onto the property, deterrence is worth the
admittedly high cost of suppression of evidence. The police
conduct in this case is a far cry from those fact patterns where
the Supreme Court has not applied the exclusionary rule despite a
Fourth Amendment violation. E.g., United States v. Leon, 468 U.S.
897 (1984) (officers objectively reasonable in reliance on
subsequently invalidated search warrants); Illinois v. Krull, 480
U.S. 340 (1987) (officers objectively reasonable in reliance on

subsequently invalidated statutes); <u>Arizona v. Evans</u>, 514 U.S. 1, (1995) (officers objectively reasonable in reliance on inaccurate clerk of court records); <u>Herring</u>, 555 U.S. at 135 (officers objectively reasonable in reliance on negligently maintained police records); and <u>Davis</u>, 564 U.S. at 247 (officers objectively reasonable in reliance on a subsequent change in binding precedent).

**(d)    Application of Exclusionary Rule**

**Defendant's Person:**  As a preliminary matter, the Court does not read defendant's argument to suggest that he may avoid indictment because his person must be suppressed.  If defendant is seeking to suppress his person, that portion of the motion is denied.

It is well established that a defendant's person will not be suppressed even if he was seized in violation of the Fourth Amendment.  <u>United States v. Crews</u>, 445 U.S. 463, 474 (1980) ("Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction."); <u>I.N.S. v. Lopez-Mendoza</u>, 468 U.S. 1032, 1039 (1984)(body or identity of defendant in criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if

unlawful arrest, search, or interrogation occurred). While the Eleventh Circuit held this portion of <u>Lopez-Mendoza</u> was dicta as to criminal prosecutions, it nonetheless did "hold that the exclusionary rule does not apply to evidence to establish the defendant's identity in a criminal prosecution." <u>United States v. Farias-Gonzalez</u>, 556 F.3d 1181, 1189 (11th Cir. 2009).

**Identification of Defendant Upon Exiting Unit A:** Defendant seeks to suppress the identification of him by the officers at the scene upon his compelled exit from Unit A. The Court agrees that these identifications at the scene must be suppressed as the primary evidence obtained as a direct result of the unlawful police conduct (although, as discussed at oral argument, cross examination may otherwise open the door to their admission).

**Other "Fruits" of Unlawful Conduct:** Defendant seeks suppression of additional evidence as the fruit of the Fourth Amendment violations, including statements made by defendant upon exiting Unit A, the interview at the police station, the buccal swab and its test results, and other identifications of defendant by the officers. Whether these items are indeed fruits of the poisonous tree has not been the focus of the motion or hearings, and at oral argument the government requested an opportunity to supplement its memoranda and/or testimony if the Court rejected the Report and Recommendation and found suppression was necessary. The Court will grant the government's request and schedule a

hearing/oral argument on the issues of what other evidence should be suppressed as a result this Opinion and Order.

### D. Independent Challenge to Buccal Swab

Defendant seeks to suppress the buccal swab (and its test results) on free-standing grounds independent of the events at Unit A. The Report and Recommendation recommended this aspect of the motion be granted, and the swab and test results suppressed. (Doc. #52, pp. 38-45.) For the reasons set forth below, the Court declines to accept this portion of the Report and Recommendation. The Court finds that, under the circumstances of this case, taking the buccal swab did not violate the Fourth Amendment, and that suppression is therefore not required independent of the events at Unit A.

Defendant was taken to the police station, where a buccal swab was taken without a search warrant or defendant's consent. The testimony of the officers was clear that the buccal swab was taken pursuant to a Florida statute and for investigative purposes, i.e., to compare with any DNA which may be found on the firearm seized from the Camry. Defendant seeks to suppress the buccal swab and its test results because it was obtained in violation of Fla. Stat. § 943.325(13)(b) and the Fourth Amendment of the U.S. Constitution. (Doc. #20, pp. 5-6.)

There is no doubt that the taking of the buccal swab in this case was a "search" within the meaning of the Fourth Amendment.

Maryland v. King, 569 U.S. 435, 446 (2013).  Additionally, the taking of a buccal swab in this case was subject to Fla. Stat. § 943.325.  The Court addresses the Florida statute first.

A Florida statute requires any "qualifying offender" who is arrested in Florida to submit a DNA sample to a department-designated facility.  Fla. Stat. § 943.325(7)(a).  This DNA sample must be submitted at the time the person is booked in a jail, correctional facility, or juvenile facility.  Fla. Stat. § 943.325(7)(b) ("Arrested qualifying offenders must submit a DNA sample at the time they are booked into a jail, correctional facility, or juvenile facility.")  See also Fla. Stat. § 943.325(3)(a) ("Each qualifying offender shall submit a DNA sample at the time he or she is booked into a jail, correctional facility, or juvenile facility.".  A "qualifying offender" includes any person "[c]ommitted to a county jail" and who is "[a]rrested for any felony offense or attempted felony offense in this state." Fla. Stat. 943.325(2)(g).

While taking the DNA sample is mandatory under the Florida statute, its use is limited.  The "analyses of DNA samples collected under this section shall be used only for law enforcement identification purposes or to assist in the recovery or identification of human remains or missing persons and may not be used for identification of any medical or genetic condition." Fla. Stat. § 943.325(13)(b).  In Maryland v. King, 569 U.S. 435

(2013), the U.D. Supreme Court found that a statute requiring DNA samples as a matter of routine booking of arrestees did not violate the Fourth Amendment.

The officers in this case did not violate the Florida statute by taking the buccal swab. The swab was taken during the booking process of a person arrested in Florida and committed to the jail for a felony offense. The statute mandated taking the swab. While the officer had the additional subjective intent to use the swab and its test results for investigative purposes in connection with the firearm, such an intent does not invalidate the taking of the swab. Rather, the officer is simply precluded from relying on the statute as justification for the search. Thus, the DNA sample and its testing results may not be used for this type of investigative purpose or in a criminal prosecution.[4] This means that some other basis must exist if the government is to be allowed to introduce this evidence in this case.

The parties focus on the Fourth Amendment, with defendant asserting a warrant or consent was required, and the government asserting the conduct in this case did not violate the Fourth Amendment. It has often been held that the touchstone of the

---

[4] The Court rejects the government's argument that the officer's investigative conduct fell within the authorized use of "law enforcement identification purposes" within the meaning of Fla. Stat. § 943.325(13)(b). The issue for the officers wasn't whether their arrestee was Miguel McSwain, but whether the arrestee was connected to the seized firearm.

Fourth Amendment is reasonableness. E.g., United States v. Knights, 534 U.S. 112, 118-19 (2001). "Under our general Fourth Amendment approach we examine the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. [ ] Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Samson v. California, 547 U.S. 843, 848 (2006) (internal citation omitted). The question becomes whether an officer who takes a warrantless, non-consensual buccal swab of an arrestee as part of the booking process, but who also has an investigative motive outside the scope of the use permitted by the state statute, acts reasonably within the meaning of the Fourth Amendment. Under the circumstances of this case, the Court finds such conduct reasonable under the Fourth Amendment without either a warrant or consent.

In Maryland v. King, the U.S. Supreme Court wrote at some length about taking a buccal swab without a warrant or consent during a routine booking procedure for serious offenses. The Supreme Court determined that the many legitimate government interests substantially outweighed an arrestee's interests in prohibiting warrantless, nonconsensual buccal swabs. The Supreme Court concluded:

> Upon these considerations the Court concludes
> that DNA identification of arrestees is a
> reasonable search that can be considered part
> of a routine booking procedure. When officers
> make an arrest supported by probable cause to
> hold for a serious offense and they bring the
> suspect to the station to be detained in
> custody, taking and analyzing a cheek swab of
> the arrestee's DNA is, like fingerprinting and
> photographing, a legitimate police booking
> procedure that is reasonable under the Fourth
> Amendment.

King, 569 U.S. at 465–66.

King informs, but does not control, this case because this is a mixed-motive situation, i.e., the officers were performing a routine booking function but also intended to use the buccal swab for investigative purposes outside the permitted scope of the state statute. While the officers in this case had more than simple booking in mind, all the observations in King about the taking of a buccal swab apply to this case as well. The investigative motive does not negate the importance of the routine booking aspects, but it certainly must be considered, and weighs on the need-a-warrant side of the calculus.

This case involves a factor which did not appear in King – here, the arrestee was on probation at the time of the arrest and booking for the new offense. A probationer has a reduced expectation of privacy by virtue of his probation status because the Court "may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."

_Knights_, 534 U.S. at 119; _United States v. Yuknavich_, 419 F.3d 1302, 1311 (11th Cir. 2005) (even if not a specific condition of his probation, a reasonable suspicion "of a sufficiently high probability that criminal conduct is occurring" is still required to justify an intrusion into one's privacy).

Here, the record establishes that defendant was on state probation at the time of his arrest in this case. The Court therefore applies the balancing test described in _Knights_ and _Yuknavich_. In doing so, the Court concludes that the degree to which the search is needed for the promotion of legitimate governmental interests greatly exceeded the degree to which the search intruded upon the arrestee-probationer's privacy. The government concedes that the lack of notice that he would be subject to warrantless DNA searches or recurring DNA samples weighs against the government in this balancing process. (Doc. #60, p. 8.) The Court agrees. The Court also agrees with the government's argument that other factors weigh in its favor. The government has a considerable interest in supervising persons on probation and attempting to ensure they to not recidivate. Defendant's status of being on probation generally diminished his expectation of privacy from those not under post-conviction supervision. Additionally, as _King_ noted, obtaining a buccal swab involves a _de minimis_ physical intrusion. 569 U.S. at 460. That being said, the Court makes no determination at this time whether

the buccal swab is otherwise subject to exclusion with the "other fruits." See supra pp. 22-23.

Accordingly, it is now

**ORDERED:**

1. The Magistrate Judge's Report and Recommendation (Doc. 52) is accepted and adopted in part, and rejected in part, as set forth above.

2. Defendant's Motion to Suppress Evidence (Doc. #20) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

3. The Clerk of Court shall schedule a supplemental hearing by separate notice.

**DONE and ORDERED** at Fort Myers, Florida, this ___14th___ day of November, 2018.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Hon. Mac R. McCoy
Counsel of Record
DCCD